UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

SYLVIA MAYORGA,                                          No.:  1:22-cv-387

                              Plaintiff,

                -against-                                 **<u>SECOND AMENDED
                                                         COMPLAINT AND
                                                         DEMAND FOR JURY
IRA GREENBERG, individually and in his official capacity, TRIAL</u>**
and THE NEW YORK STATE DIVISION OF HOMELAND
SECURITY AND EMERGENCY SERVICES,

                              Defendants.
-----------------------------------------------------------------------X

   Plaintiff, Sylvia Mayorga, by and through her attorneys, Mark David Shirian P.C.,

complaining of the Defendants, The New York State Division Of Homeland Security And

Emergency Services, and Ira Greenberg, individually and in his official capacity, respectfully

alleges as follows:

   1.  This firm, Mark David Shirian P.C., represents Plaintiff Sylvia Mayorga

(hereinafter "Plaintiff") in connection with her claims against her former employer, Defendants

The New York State Division of Homeland Security and Emergency Services ("DHSES"), and

her former supervisor Ira Greenberg, individually and in his official capacity, (hereinafter

"Defendant Greenberg"), (collectively, "Defendants").

   2.  Specifically, Plaintiff brings this action for sexual harassment, gender

discrimination, hostile work environment, sexual orientation discrimination, race discrimination,

and national origin discrimination, pursuant to Title VII of the Civil Rights Act of 1964, as

amended,  the New York State Human Rights Law ("NYSHRL"), New York Executive Law 290

*et seq.*, N.Y. Exec. L 296 *et seq.,* and the New York City Human Rights Law ("NYCHRL").

   3.  This claim is also for assault, and battery against Defendant Greenberg.

## JURISDICTION AND VENUE

4.     This court has original federal question jurisdiction under 28 U.S.C. 1331 and 1343 because this case is brought for sexual harassment, gender discrimination, and hostile work environment, under Title VII  other unlawful conduct. This Court has diversity jurisdiction and supplemental jurisdiction over Plaintiff's NYSHRL, NYCHRL and intentional tort claims against Ira Greenberg, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Additionally, Plaintiff and Defendant Greenberg reside in different states and the amount in controversy is over $75,000.00.

5.     Venue properly lies in the Eastern District of New York pursuant to 28 U.S.C. 1391(b), because the claims arose in this judicial district and the defendant is doing business in this District.

## PROCEDURAL BACKGROUND

6.     In or around April 16, 2021, Plaintiff filed a Charge against defendant NYS Division of Homeland Security and Emergency Services ("DHSES") with the U.S. Equal Employment Opportunity Commission ("EEOC") for violations under Title VII, and city and state laws. She was assigned EEOC Charge Nos 520-2021-02724 and 520-2021-02726.

7.     On or about January 12, 2022, the U.S. Department of Justice issued a "Notice of Right to Sue" to Plaintiff advising her of her right to file a civil action against defendant DHSES within 90 days of her receipt of the notice.

8.     This lawsuit has been timely filed within 90 days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

9. In or around April 20, 2021, Plaintiff served a Notice of Intention to File a Claim against defendant NYS Division of Homeland Security and Emergency Services.

10. Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

11. Ms. Sylvia Mayorga is a 34 year-old Hispanic bi-sexual female and resides in the City of Newark, State of New Jersey. At the time before commencing her employment at DHSES, Ms. Mayorga earned a Master of Science in Homeland Security from Farleigh Dickinson University and graduated in 2014.

12. At all relevant times, Plaintiff Sylvia Mayorga met the definitions of an "employee" under all applicable statutes.

13. At all times material, Defendant DHSES (hereinafter also referred to as "DHSES," "Defendant") is an arm of the state created and authorized under the laws of the State of New York to manage the homeland security for the state of New York.

14. At all times material, Defendant DHSES employed Plaintiff.

15. At all relevant times, DHSES has met the definition of an "employer" under all applicable statutes.

16. DHSES was an employer of Sylvia Mayorga at all relevant times to this action.

17. DHSES is and was at all times relevant hereto a state agency, and an agency or other administrative subdivision of the State.

18. Defendant Ira Greenberg, is a male who was a supervisor at DHSES. Upon information and belief, Defendant Ira Greenberg presently resides in the State of New York.

19. Defendant Ira Greenberg is and was at all relevant times herein acting in the course and scope of his duties and functions for DHSES as an agent, Assistant Commissioner, servant,

supervisor, project manager, and employee of defendant DHSES and was acting for, and on behalf of, and with the power and authority vested in him by DHSES and the State of New York, and was otherwise performing and engaging in conduct incidental to the performance of his functions in the course of his duties as a supervisor and Assistant Commissioner, who implemented, enforced, and/or effectuated the policies and unlawful conduct of which is the subject policy of this action. Defendant Ira Greenberg is sued in his individual and official capacity.

20.     At all relevant times relevant hereto, Defendant Ira Greenberg exercised managerial and/or supervisory responsibility over the Plaintiff.

21.     At all relevant times, Ira Greenberg has met the definition of an "supervisor" under all applicable statutes.

22.     Ira Greenberg was a supervisor of Sylvia Mayorga at all relevant times to this action and had the ability to hire and/or fire Sylvia Mayorga.

## FACTUAL BACKGROUND

23.     On March 21, 2019, Ms. Mayorga was hired by DHSES as a Regional Coordinator for the New York City Region I at a $56,000 base salary plus benefits. Her duties and responsibilities as a Regional Coordinator included representing the State in any matters in the downstate region, including meetings, conferences and field responses when there were events or incidents in the five boroughs which required State intervention and was on for 24 hours a day and 7 days of week. She also coordinated, assessed and tracked State resources.

24.     At all times relevant to this action, Ms. Mayorga exclusively utilized DHSES equipment, including but not limited to, telephones, computers, stationery, vehicles, fax machines and other facilities. DHSES also maintained records of hours and directly supervised Ms. Mayorga on a daily basis.

25.     In the course of performing the duties of her position, Ms. Mayorga was forced to endure a hostile work environment by her supervisor, Defendant Greenberg, because of her gender, sexual orientation, race and national origin, which was severe and pervasive and altered her working conditions, which led to her eventual constructive discharge.

26.     The unlawful acts forming the basis of this complaint began in March 2019. Ms. Mayorga was the victim of uninitiated, unprovoked, harassing, graphic, and sexual and racially insensitive comments from Mr. Ira Greenberg, Assistant Commissioner, employed by DHSES. It is believed that Mr. Ira Greenberg was Ms. Mayorga's supervisor with successively higher authority over her. Mr. Ira Greenberg abused his power and sexually harassed Ms. Mayorga by subjecting her to sexual harassment and a hostile work environment. Specifically, Ms. Mayorga was repeatedly subjected to sexual harassment and inappropriate and unwanted touching by Mr. Ira Greenberg and sexually and racially charged comments, epithets and advances.

27.     Nikhil Natarajan was Ira Greenberg's Supervisor. Defendant Ira Greenberg was Matthew Alilionis, the Regional Director's, supervisor. Matthew Alilionis was also Plaintiff, Sylvia Mayorga's supervisor.

***MARCH 2019***

28.     In or around March of 2019, Mr. Greenberg would frequently speak to Ms. Mayorga about female co-workers Jillian Ringhauser and Nicole Marks when she first started her employment. Mr. Greenberg would tell Ms. Mayorga to not be like them, stating that they complained too much when they were given orders outside of their job description, referred too much to union material and policies, and were "ICS Nazi's". Mr. Greenberg said as long as Ms. Mayorga was "flexible", that she would be fine. At a certain point, Ms. Mayorga learned that complaining about Mr. Greenberg would not get very far.

29.     During the course of the first six months of Ms. Mayorga's employment, Mr. Greenberg would often check on Ms. Mayorga at her cubicle. Mr. Greenberg asked Ms. Mayorga if everything was okay, to which she responded yes. Their interactions were often awkward, especially because Mr. Greenberg would often stand at Ms. Mayorga's cubicle and stare at Ms. Mayorga while she was seated at her computer chair. Mr. Greenberg often stood about 1-2 feet away from Ms. Mayorga, and her face was level with Mr. Greenberg's belly button so when she would look up, it would be towards his crotch area.

30.     As Mr. Greenberg was walking away, he turned around, and asked Ms. Mayorga: "Are those your real eyes?" Ms. Mayorga said "yes, they look different because of the sun coming from that window." Mr. Greenberg said, "wow. So those are your real eyes, huh." Mr. Greenberg fell silent and continued staring at Ms. Mayorga intensely as he inched closer to Ms. Mayorga slightly in a sexual manner. Ms. Mayorga did not move and was not sure how to react while he was staring and not speaking. After about ten seconds, Mr. Greenberg snapped out of it and ended it with his usual "it's all good." and walked away.

31.     In or around the summer of 2019, Ms. Mayorga received a call one morning from William "Billy" Cullen, who is the Director of Security as well as the Commissioner's direct assistant. Mr. Cullen informed Ms. Mayorga that the Commissioner directed Ms. Mayorga to transport two Finance Division executives to Albany immediately. Mr. Cullen told Ms. Mayorga that the Commissioner instructed Ms. Mayorga to start driving towards Harlem and that they would send Ms. Mayorga the information of the pickup address while she was en route.

32.     As a result, Ms. Mayorga left her tasks as is and started to make her way towards her vehicle with her response back pack which consisted of a laptop, tablet, and other accessories for field response. Ms. Mayorga loaded up her car and got in. As she was about to call Mr.

Greenberg, he called Ms. Mayorga first for something unrelated. Ms. Mayorga said, "great, I was just about to call you. I'm sitting in her car, Billy called me and said the Commissioner needs me to transport someone to Albany. They want me to start making her way to Harlem now…"

33.     Mr. Greenberg became extremely upset and began screaming at Ms. Mayorga through the phone "What do you mean you're leaving?! I don't care who gave you an order! You report to me and only me! Don't you move that car! I'm going to clear this up right now! You report to me!". And he hung up. Ms. Mayorga began frantically crying at this point. She does not recall who she spoke to first but she alternated speaking to both Matthew Alilionis (her direct supervisor) and Karen Laird (office manager and longtime employee for NYS Homeland Security). They kept calling Ms. Mayorga because they knew what was going on, how upset she was, and they were trying to mitigate the situation and calm Ms. Mayorga down because she still had to pick up these two men and drive them to Albany with lights and sirens on.

34.     Ms. Mayorga was directed to drive to Albany because there had been a very serious cybersecurity breach and it was pertinent that these two individuals arrive in Albany immediately.

35.     Mr. Greenberg called Ms. Mayorga and told Ms. Mayorga to do what the Commissioner had instructed but that he would finish with her when Ms. Mayorga returned. Later on, Ms. Mayorga's phone rang and it was Mr. Greenberg, who screamed and reiterated the same information as before. This call consisted of Mr. Greenberg seeking validation to the question "Tell me who is your boss?! Tell me who you report to!" To which Ms. Mayorga would respond while crying, "You. You, Ira. You're my boss. I report to you! Ms. Mayorga was just doing what she was told. Ms. Mayorga never witnessed Mr. Greenberg speaking in this manner to other male employees and believes that Mr. Greenberg spoke with her in this tone because of her gender.

36.     Eventually Ms. Mayorga was told to return to New York City by Mr. Greenberg. Ms. Mayorga was upset and nervous that she spilled her entire tea all over the table, chair, and floor which only added to her embarrassment and emotional pain.

37.     Mr. Greenberg often had an issue with feeling left out in his own region. Mr. Greenberg said that he did not want to look bad to anyone in Albany because they might see him as a joke if he did not have control and visibility of his own region. He told Ms. Mayorga that he had problems with the two previous employees, Andrew Natoli (currently employed by the TSEP Division) and Mark Allen (now with FEMA). He said that Andrew and Mark did not share information with him and that he always felt like he was in the dark. To calm Ms. Mayorga down, he said he was simply trying to protect Ms. Mayorga and that is why he became so aggressive with Ms. Mayorga over the phone. He told Ms. Mayorga "You don't realize but I'm just trying to protect you from things you don't know and don't understand. This is for your own good."

38.     Later that day, Commissioner Patrick Murphy called Ms. Mayorga himself to thank Ms. Mayorga for completing this task so quickly. He also called to tell Ms. Mayorga that he heard what happened with Ms. Mayorga and Mr. Greenberg and that he was sorry that Mr. Greenberg screamed at Ms. Mayorga. He assured Ms. Mayorga that she did nothing wrong and that Mr Greenberg was spoken to regarding how he reacted.

39.     During the first year of Ms. Mayorga's employment, Plaintiff suffered incidents of gender bias by her supervisor, Defendant Greenberg. Specifically, Mr. Greenberg started making fun of "firing Ms. Mayorga" early on when she began working with DHSES. He used to "joke" like this daily. At first, Ms. Mayorga did not pay much mind to him because they already had issues previously with how he spoke to Ms. Mayorga in a demeaning tone and how he would

scream at Ms. Mayorga. Defendant Greenberg never joked like this towards other male employees and only targeted plaintiff because she is female.

40.    Ms. Mayorga wanted to just steer clear of Mr. Greenberg as much as she could. During the first year of her employment (and after their first few encounters of Mr. Greenberg Mr. Greenberg screaming at Ms. Mayorga), he asked Ms. Mayorga to come into his office to justify himself. Mr. Greenberg informed Ms. Mayorga that he gets very volatile when situations arise because he has ADD/ADHD. He went on about how that's just the way he is so Ms. Mayorga had to forgive him when he gets out of line with the screaming and disrespect. Mr. Greenberg told Ms. Mayorga during response events or high stress times he sometimes has trouble controlling how loud he gets, how he acts and reacts. He frequently blamed the things he would say on his ADD/ADHD but he assured Ms. Mayorga that he would always come to Ms. Mayorga and apologize after. Mr. Greenberg said that if Ms. Mayorga ever had an issue with him to go to him first so they could resolve it internally and that he would "take care of her". Ms. Mayorga now realizes this was just his way of making sure he was the gatekeeper to any of her complaints so they would never be recorded.

41.    In or around November 2019 at the NYSEMA Conference, Mr. Greenberg "fired" Ms. Mayorga at the NYSEMA conference as a "joke" during a Q&A session after she asked a question that the Commissioner, who was on stage, could not answer. Ms. Mayorga played along because everyone in the room had broken out into laughter. Mr. Greenberg only had to do it once. From that point forward, everyone knew Ms. Mayorga as the female who was fired by her boss every couple of hours. As a result, Ms. Mayorga had complete strangers come up to Ms. Mayorga the rest of the conference to ask how many times she was fired so far that day. Later on, Mr.

Greenberg came up to Ms. Mayorga and instructed her to "never ask questions when one of your superiors are on stage. Just listen and be quiet."

42.     Karen Laird, a NYS Homeland Security Office Manager, and Matthew Alilionis had been present on multiple occasions where Mr. Greenberg "fired" Ms. Mayorga. This was as overwhelming for Ms. Mayorga as it was embarrassing. Ms. Mayorga was already on edge from Mr. Greenberg constantly reminding Ms. Mayorga that she was on probation and that he could fire Ms. Mayorga at any time. To protect herself, Ms. Mayorga would laugh along because she did not want to tell anyone that it was bothering Ms. Mayorga for fear of losing her job. Mr. Greenberg would enjoy and find humor in Ms. Mayorga getting nervous and visibly upset when he would say that she was going to get fired. He would constantly remind Ms. Mayorga that he could fire Ms. Mayorga at any time while laughing at Ms. Mayorga.

43.     When Ms. Mayorga was at her breaking point after he publicly "fired" Ms. Mayorga, Ms. Mayorga called Lindsey Einhorn (NYC Emergency Management) to vent to her while she sat in her car outside of her hotel during the 2019 NYSEMA conference. Ms. Mayorga even considered quitting. Defendant Greenberg never jokingly fired any other male employees and only targeted plaintiff because she is female.

44.     Mr. Greenberg also made it a point to almost daily to remind Ms. Mayorga that she was still on probation if she disagreed with him on something or had suggestions. His favorite way to say it was "You know what? You talk a lot of shit for someone who is on probation. Don't forget I hired you. You know what? You're fired! Now get out of here!" and if Ms. Mayorga tried to speak again he would scream even louder "WHY ARE YOU STILL STANDING HERE?! YOU'RE FIRED! GET OUT! NOW!" Ms. Mayorga would go hide in the third stall of the women's bathroom until the anxiety and panic attacks episodes would pass. Defendant Greenberg never

reminded other male employees that they were on probation and only targeted plaintiff because she is female.

**JONES BEACH TEST SITE – COMMAND STAFF AREA**

45.     Defendant Greenberg also did not respect Plaintiff's personal space and sexually harassed Plaintiff. Specifically, in or around March 16-22nd 2020, Ms. Mayorga began working as the Situation Unit Leader in the Planning Section of the Command Staff at the Jones Beach COVID-19 Drive-Thru Test Site. Mr. Greenberg came up behind Jillian Ringhauser and Ms. Mayorga who sat shoulder to shoulder. Mr. Greenberg kept coming closer until his belly was up against Ms. Mayorga and Jillian's shoulder; his hip and thigh on the back of Ms. Mayorga and Jillian Ringhauser's arms. This was extremely uncomfortable because 1)  Mr. Greenberg was physically touching Ms. Mayorga and Jillian Ringhauser, 2) Ms. Mayorga and Jillian Ringhauser did not call Mr. Greenberg over, as he approached them to look at their computer screens to see what they were working on (which he did very frequently throughout the day  with no purpose or intent other than to make his presence known; and 3) Mr. Greenberg stood there for what felt like minutes.

46.     Each time Mr. Greenberg would embarrass Ms. Mayorga publicly, he would come over to Ms. Mayorga and ask to speak in private at which point Ms. Mayorga would always oblige because of his seniority. He would always give Ms. Mayorga the same speech: "I'm sorry I screamed at you. You know I didn't mean it. You know how I get sometimes. I'm just trying to protect you. Next time you have an issue, just come straight to me and you know I'll always take care of you. It's all good. We'll figure it out." And Mr. Greenberg would always finish it off with pulling Ms. Mayorga in for an unwanted, inappropriate hug because Plaintiff is a female. Plaintiff

does not recall any other incidents of Defendant Greenberg attempting to give other male coworkers a hug.

47.     Ms. Mayorga was always crying at the Jones Beach test site and a lot of people who were also present witnessed how Mr. Greenberg used to scream at and belittle Ms. Mayorga because of her gender. Ms. Mayorga visited Brian Sherwood and the others from OFPC anytime she was upset because Mr. Greenberg never really went into the PPE fit test trailer. Ms. Mayorga recalls one of the worst episodes she had was when she walked in crying after Mr. Greenberg screamed at Ms. Mayorga about the testing count and asked Brian if it was okay if she sat at the back of the trailer. There were people being tested so Ms. Mayorga held back her tears as best as she could as she made eye contact with Brian who immediately said of course and pointed Ms. Mayorga to the back closet that had a door. Ms. Mayorga would hide in the PPE testing trailer because they had a closet off the back with nothing in it but a chair and desk. This is where Chris Collins (the Incident Commander at Jones Beach) had his "office". After Chris Collins had seen Ms. Mayorga visibly upset, he said that she could use his hidden corner any time she needed to get away, which she frequently used to be out of Mr. Greenberg's line of sight.

**FOUNTAIN AVE BROOKLYN TEST SITE EARLY SUMMER 2020**

48.     Plaintiff also endured incidents of hostile work environment due to her race / national origin because of Defendant Greenberg's unlawful conduct. Specifically, in or around Summer 2020, Ms. Mayorga went into the office with sneakers, camouflage leggings, her work shirt, and her work jacket. Ms. Mayorga usually dressed down on Fridays or days where she would have no meetings and no one would be in the office. On one morning, Mr. Greenberg requested that Ms. Mayorga bring him one box of masks, one box of small hand sanitizers, and a folder to the test site that he was stationed at in Brooklyn. Ms. Mayorga retrieved the items and drove to

Brooklyn. Ms. Mayorga went inside to bring the items. Ms. Mayorga was there for about 5-10 minutes and then left. While Ms. Mayorga was driving back to Manhattan, Matthew Alilionis (Ms. Mayorga's direct supervisor) called Ms. Mayorga and said that Mr. Greenberg wanted him to tell Ms. Mayorga not to wear leggings to work anymore. Ms. Mayorga asked him why, as many of the other non-Hispanic women at the test sites that she had been to were permitted to wear leggings all the time, including Jen Andujar whom was a favorite of his to request at test sites. Ms. Mayorga said that Mr. Greenberg never said anything to Jen about her leggings.

49.     Matt then said "I don't know, I'm just telling you what he told me. I have no idea what's going on." Ms. Mayorga said okay and hung up. Ms. Mayorga was immediately confused because to her knowledge, Mr. Greenberg had never told any other woman on the job to not wear leggings to work, upon her information and belief. Ms. Mayorga felt as though she was being singled out because of the shape of her buttocks and Hispanic genetics.

50.     Additionally, Mr. Greenberg made comments on Plaintiff's physical appearance. Specifically, Mr. Greenberg on multiple occasions referred to how much he liked Ms. Mayorga's eyes and nose ring. On one of the last days Ms. Mayorga was at the test site, Mr. Greenberg turned back around after they had walked away from a conversation to whisper in her ear "by the way, I love the ponytail today" and that he "liked (her) hair like that" while running his hand down her braid as he walked by and inappropriately touched her braid. Ms. Mayorga had her hair in a braided ponytail. Mr. Greenberg had always violated Ms. Mayorga's personal space by standing too close to Ms. Mayorga.

51.     Mr. Greenberg had inappropriately hugged Ms. Mayorga on multiple occasions because of her gender, as Ms. Mayorga did not ever witness Mr. Greenberg attempting to hug other male workers. However, Ms. Mayorga did not push Mr. Greenberg away for fear of retaliation.

Flor from the Brooklyn test site *witnessed* Mr. Greenberg hugging Ms. Mayorga. Flor was the doctor who drove Ms. Mayorga to Overlook Hospital ER when Ms. Mayorga was removed from work due to mental distress. The last time Mr. Greenberg tried to hug Ms. Mayorga was in Queens in or around January 29, 2021.

**JANUARY 17 2021 – RECEIVED FIRST DOSE OF PFIZER VACCINE**

52.     Ms. Mayorga's direct supervisor Matthew Alilionis and Karen Laird had to call Mr. Greenberg to "speak to him about Ms. Mayorga needing days off after experiencing very intense side effects from her first dose of the COVID-19 vaccine, which Ms. Mayorga received on January 17, 2021.

53.     Ms. Mayorga was extremely sick and she continued to work from home regardless. Ms. Mayorga was remotely accepting deliveries, conducting planning section responsibilities, submitting New York Responds Requests for logistics, updating and monitoring New York Responds for information and updates, among many other tasks.

54.     Ms. Mayorga was exhausted and was not getting any better. Ms. Mayorga had a fever of 101, body aches, congestion, and a headache. Mr. Greenberg was still very demanding the entire time and kept pressing Ms. Mayorga every day, several times a day, to go back to the site in person. Ms. Mayorga told him that she was still very visibly sick and it would make people very upset if she went in person.

55.     At the time not even taking into consideration that Ms. Mayorga was extremely ill and not improving by much, she almost went forced herself to go in to work one morning. However, Ms. Mayorga told him that she had no control over how her immune system responded to the vaccine. Mr. Greenberg said that he understood but that he was not happy with the current situation because he was a "visual person."

56.     Ms. Mayorga asked Mr. Greenberg what he meant by "visual person" and he said, "you know. I need to see you here. In the office. I'm visual. I don't like this virtual thing. I need you back here." Mr. Greenberg sounded very serious and very upset, presumably because Defendant Greenberg derived pleasure by starring at Ms. Mayorga.

57.     Ms. Mayorga could hear in the background that he was pacing around the office while he was on the phone with Ms. Mayorga. Ms. Mayorga was terrified of Mr. Greenberg at this point. Matthew called Ms. Mayorga to check how she was feeling and Karen had called him on the other line. Matthew conferenced Karen in and the three of them had a conversation about how stressed Ms. Mayorga was at the site and how Mr. Greenberg was out of control. Karen and Matt heard it in Ms. Mayorga's voice and offered to call him on her behalf. Ms. Mayorga is not aware of what the conversation was between them but after that she received Sunday and Monday off.

**THE WEEK OF JANUARY 17, 2021 – JANUARY 23, 2021**

58.     Ms. Mayorga was the Planning Section Chief within the Incident Command Structure (ICS) and she directly reported to Mr. Greenberg who is the Incident Commander. Mr. Greenberg never truly allowed Ms. Mayorga to conduct the Planning Section Chief position in the best way that was conducive to the operation. Mr. Greenberg wanted Ms. Mayorga to have a broad reach in each of the branches so that he could be informed at all times through Ms. Mayorga but he wanted Ms. Mayorga to operate like his personal assistant more than his Planning Section Chief. Mr. Greenberg never liked when Ms. Mayorga spoke at meetings because she is a Hispanic female and definitely made it obvious to everyone else, much less allow Ms. Mayorga to facilitate the general staff and command meetings as indicated in the ICS guidance.

59.     Mr. Greenberg preferred to run the meetings because it gave him a sense of control so Ms. Mayorga never pushed for him to let Ms. Mayorga do it, even though it infringed upon Ms.

Mayorga's duties and responsibilities. Mr. Greenberg never allowed Ms. Mayorga sit in on any meetings that she should have sat in on for situational awareness and continuity of operations. Instead, Mr. Greenberg would command orders toward Ms. Mayorga after coming out of any conference call without sharing more information. Mr. Greenberg would share just enough to allow Ms. Mayorga to get the task done but not enough so that Ms. Mayorga had an opinion about it. This made Ms. Mayorga's job extremely difficult because she was forced to complete tasks with bare minimum information which would leave Ms. Mayorga relying heavily on Mr. Greenberg for information.

60.    When Ms. Mayorga would come to Mr. Greenberg with a question or clarification, he would pretend to be bothered as if she did not know what she was doing and that she was pestering him. However, Ms. Mayorga could tell in his body language and his way of speaking so matter-of-factly that Mr. Greenberg thoroughly enjoyed that she depended on him to some extent.

**Traffic Management Plan Issues**

61.    Defendant Greenberg also engaged in instances of gender bias by disregarding the suggestions of Plaintiff over the suggestions of male counterparts just because Plaintiff is a Hispanic female. Specifically, Plaintiff brought to the attention of Ira Greenberg and Jeremy Shockett (Gov. Office Exec.) that the traffic plan that came in from near the airport entrance to the casino resort for COVID-19 Vaccine Testing was confusing and missing signage. Ira and Jeremy stated that it could not be true because they were certain that there was enough Variable Message System (VMS) boards.

62.    Ms. Mayorga tried to tell them that she had received several complaints from vendors and the public but both Ira and Jeremy kept cutting Ms. Mayorga off by saying "it's fine

how it is, why are you always looking for what's wrong with things? Are you positive there are absolutely no signs out on that road? Because if I go out there and there are signs…"

63.     Ms. Mayorga became very nervous. Jeremey and Ira both told Ms. Mayorga: "So, get in your car, and drive around so you can finally see there are signs there." Ms. Mayorga was extremely nervous as this point as well as frustrated so she told them it was fine that we'll leave it how it is. Ira looked at Ms. Mayorga and said, "What are you still doing here? Go! Go! Get out!". Ms. Mayorga drove around the premises. When she returned, Ms. Mayorga went back into command area and told them that they were correct that there were two boards at the entrance off the highway but that when Plaintiff drove around the other side….." and then they cut Ms. Mayorga off again before she could complete her statement. They cut Ms. Mayorga off to say "okay so there are boards, that's it. You happy now?"

64.     Several days later, after receiving more complaints from the public, vendors, State DOT drivers as well as the staff in the greeting area for several days, Ms. Mayorga had SGT Whitman Chan DMNA accompany her to raise the concerns once again about supplementing the traffic plan with VMS boards to Mr. Greenberg.

65.      SGT Chan felt that VMS boards were needed and that her recommendations for updates to the traffic management plan were appropriate. Ms. Mayorga's concerns were once again dismissed and a few more times after that. Close to a week later, Mr. Greenberg finally drove through the entrance that Ms. Mayorga and SGT Chan had been referring to and Mr. Greenberg came to Ms. Mayorga and said order VMS boards for that other road, and put out signs, it doesn't have any.

66.     Ms. Mayorga responded to him and asked: "the boards that SGT Chan and I were asking you for?" He said "listen I don't care, just get it done." Ms. Mayorga tried to speak again

to get clarification on the specification of the VMS boards and if he wanted any other traffic control devices. He then started screaming "I SAID GO! GO! GET IT DONE NOW! WHY ARE YOU STILL STANDING HERE?!" Then Ms. Mayorga went and submitted NYR#340810 Request for 2 VMS Boards to Aqueduct PoD. This took place in the command staff area.

67.     Defendant Greenberg did not pay attention to this issue with the traffic plan until it was brought up by SGT. Chan, a male, who brought to Defendant Greenberg's attention.

68.     Defendant Greenberg did not allow Plaintiff to offer suggestions or her own opinions during meetings because she is a Hispanic female.

69.     Specifically, in or around the week of January 2021, the Vaccine Site at the Aqueduct had an issue with being short on the number of meals that was ordered for the site. This was brought up during the command staff meeting as an issue needing resolution. Others were offering their comments, suggestions, and observations. When everyone was done speaking, Ms. Mayorga raised her hand and offered to create a numbered meal voucher system which would be a simple small ticket with "Aqueduct PoD" on it and a number so that we could accurately count meals without having to cross contaminate sign in sheets and pens, etc. and also prevent the Logistics Section Chief Ian Jordan from having to stand there and watch as each person grabs one meal and signs the sheet. Her logic was that Ian's time could be better spent than standing outside next to the meals for two hours while everyone trickles in to grab their food.

70.     However, Mr. Greenberg did not even allow Ms. Mayorga to get past "meal voucher system" before cutting Ms. Mayorga off and saying no Ms. Mayorga tried to ask him to allow her to explain her reasoning and thought process behind her observations and recommendation but he just kept getting louder and louder as he yelled "Sylvia, STOP. I SAID ENOUGH." This was in front of the entire command and general staff at the AM meeting. The

entire staff fell dead silent. So, Ms. Mayorga stayed quiet the rest of the meeting and went into her office and closed the door. Ira came in shortly after, closed the door behind him and said "don't ever do that again". Ms. Mayorga said to him "what? Make an educated observation and give a suggestion?" he said "no, what you did in the command staff meeting. Don't involve yourself in things you're not asked to get involved in. And when I tell you to be quiet, you be quiet."

71.    Ms. Mayorga told Ira that she understood his message and that she would no longer make suggestions to command staff unless it was a life safety issue at which point, Ms. Mayorga would be ethically and morally obliged to say something. Ms. Mayorga also said this to SGT Chan. But Ms. Mayorga informed Ira that she would no longer be putting herself in the path of his anger by offering constructive criticism on any of his operational decisions.

72.    Mr. Greenberg did not like that Ms. Mayorga was being very serious with him and he tried to retract what he was saying but at that point Ms. Mayorga told him it was "fine not to worry about it, that he would no longer have that issue with Ms. Mayorga" and she walked away. The traffic management plan and meal tickets (among others) were enough to dampen her spirit of being innovative and proactive because of how Ms. Mayorga was constantly spoken to and dismissed on several occasions due to her gender and race, since Defendant Greenberg did not limit any other males from offering their opinions or feedback during meetings. Ms. Mayorga spent the rest of her day in her office with the door closed.

73.    Additionally, during a separate General Meeting, Ms. Mayorga had mentioned that Dr. Heslin from DOH had shared some best practices with Ms. Mayorga while she was at the Javits Center. One thing that the Javits site had been doing was stamping a small J on the back of the card so when people returned for their second dose, Javits staff would know their first dose was in fact received at the Javits. And no one had to go into the system to verify it, which speeds up the

process when there was a higher volume. At the time, Ms. Mayorga though that this could be helpful down the road and mentioned it during the general meeting. Ira Greenberg became upset when Plaintiff mentioned this best practice, immediately dismissed it and moved on.

74.     Later on, Ira Greenberg came up to Ms. Mayorga and said "I don't care who gives you ideas. I'm the incident commander. We don't need a stamp. Stop trying to change things."

75.     It became clear that Defendant Greenberg did not value Plaintiff's input because of her gender, race and national origin.

## AQUEDUCT VACCINE POINT OF DISTRIBUTION (POD) JANUARY TO FEBRUARY 2021

76.     Shortly after starting operations, a system was created at the vaccine site in Queens for a waitlist. This was so that already-prepared COVID-19 doses would not go to waste. Anyone on this list had to report to the site within 20 minutes of being notified, otherwise the vaccine dose would have to be discarded. These waitlist slots were filling in cancelled appointments, people turned away, and no-shows. Ms. Mayorga noticed that Ira Greenberg was compiling a list of close friends and family, coworkers etc., that other Command Staff members added to daily. Defendant Greenberg never asked Ms. Mayorga if she had anyone in mind, which she did. Several male members from the Command Staff were encouraged and allowed to add who they wanted to the list if they fell under the current regulations.

77.     One day, apparently Ira Greenberg was eavesdropping on Nicholas Dantuono from Department of Health and Ms. Mayorga. Nicholas came to Ms. Mayorga to inform Ms. Mayorga about the waitlist and said that if she had anyone in mind that fit into the current guidelines, to let him know and he would add them to the list. He told Ms. Mayorga that he felt that *everyone* should be able to have the opportunity to add to this list. Shortly after, Ira Greenberg had a conversation with Nicholas regarding information-sharing with Ms. Mayorga. Ira told Nicholas that he didn't

want him giving Ms. Mayorga any more information or speaking to Ms. Mayorga especially about the end-of-day waitlist for the vaccine distribution. Ira stated that Ms. Mayorga should not be involved in any conversations with DOH from now on. He told Nicholas he was not allowed to share information with Ms. Mayorga anymore.

78.    Defendant Greenberg also made comments about Plaintiff because she is a Hispanic female. Specifically, Ms. Mayorga was in the DOH office either that day or the following day for a tracking form needed by Dr. Pena and/or Dr. Vanessa and other Doctors on the vaccine side of operations. Mr. Greenberg went over to where Ms. Mayorga was speaking with the doctors, interrupted, and said "don't trust her with information she's dangerous." The doctors turned around to look at him. Mr. Greenberg said "I'm just kidding" and laughed and walked away. This was the second time in one day that Ms. Mayorga heard Mr. Greenberg say that she was dangerous with information. Mr. Greenberg said Ms. Mayorga was too smart and that with the right information she was dangerous. Of course, following it with "I'm just kidding, you're doing a great job." Mr. Greenberg told Ms. Mayorga before on several occasions "I know you're going to take my job. I know you are. You could do my job better than me."

**ADDITIONAL INCIDENT OF SEXUAL HARASSMENT**

79.    In or around January 27, 2021, Ms. Mayorga went to the restroom and realized that she had torn a hole in the inner leg of her work pants near her crotch area. Ms. Mayorga tied her black rain jacket around her waist and went into the command area to advise Ira Greenberg that she had torn her pants but for the time being she would cover it with her jacket because there was too much to do on site. Ms. Mayorga told Mr. Greenberg that the tear was covered so she was fine at the moment but that at some point in the day when it's not so busy, she would have to run to her house to grab some pants or go somewhere to buy some.

80.     Mr. Greenberg was sitting at his desk with approximately 2-3 other male individuals standing around him in conversation. An additional two other staff members walked through the command at different points during this conversation.

81.     Ian Jordan commented and suggested that Ms. Mayorga should check for a nearby uniform store. Mr. Greenberg suggested Kmart. Ms. Mayorga said that she would use one of those options later. Ms. Mayorga continued to say how she could not believe that she tore a hole in her pants.

82.     Mr. Greenberg then said while laughing "let me see." Ms. Mayorga said "no". Mr. Greenberg kept laughing and said "come on, let me see. Ms. Mayorga again said "no" and Mr. Greenberg laughed and said "come on, what color underwear are you wearing?" and continued to laugh. Mr. Greenberg again asked "come on, what color underwear are you wearing?" Ms. Mayorga again said no and gave a nervous laugh as other males in the room started to laugh. Ms. Mayorga then changed the subject to something else, shortly after she walked away. Ms. Mayorga was completely embarrassed and in shock. Ms. Mayorga spent the rest of the day in the office where her desk was with the door closed. Ms. Mayorga reported this incident to her counterpart and Regional Coordinator from Long Island, Daniel Sicilian.

83.     In or around January 29, 2021, Ms. Mayorga arrived at the office in the morning around 06:50 AM. Mr. Greenberg, while staring at his phone and not looking at Ms. Mayorga, or even saying good morning, walked passed Ms. Mayorga on his way to the DOH office and nonchalantly said "you're taking over the 12pm and 7pm report that goes to Chamber, Yamil Speight-Miller is not doing it anymore" and he started to walk away.

84.     Ms. Mayorga tossed her stuff on her desk and ran to catch up behind Mr. Greenberg and said "hold on Ira, no, you said to let you know when my tasks get to be too much and I'm

waving the red flag and telling you this is too much. I can't handle another task on top of everything else I do here and with all the stress I am under". Mr. Greenberg very sarcastically said "what do you mean ALL your tasks? What TASKS do you have? What stress?" Ms. Mayorga started listing things like editing and updating the IAP, disseminating it, submitting NYR requests, tracking NYR requests in a special spreadsheet specifically drafted for Ira every day to help his situational awareness, following up on all pending requests with the EOC, accepting deliveries, updating NYR with receiving information, coordinating the emergency retrieval of DOH forms, going to pick up orders at Staples and Javits, interpreting Spanish for him on site, and assisting people log in with QR codes.

85.     Mr. Greenberg cut Ms. Mayorga off and said "well I don't really care you're doing it. Ms. Mayorga told him that she was communicating to him that she felt overwhelmed and he's putting too much on her plate. Mr. Greenberg proceeded to say "well we'll have everything forwarded to you and if I have to, I'll do the damn report myself, but I hate to say it, it is absolutely the planning section chief's job to do it". Ms. Mayorga got upset because Mr. Greenberg was not listening to what her needs were.

86.     Mr. Greenberg again tried to give Ms. Mayorga an inappropriate hug while they were standing next to his desk. Ms. Mayorga's back was to the command office glass door entrance. Mr. Greenberg put his left arm around Ms. Mayorga and said "look, come here..". Ms. Mayorga put her arm up against his chest and she stepped back and said "no, this time a hug isn't going to fix it. You told me that there were no lanes, no 'ICS Nazi's' allowed on this site. And now all of a sudden, I have a 'defined role' because it's convenient for you? No. I want you to remove me from this site immediately. Find a replacement planning section chief because if you're not

going to listen to me telling you that it's too much and you're forcing me to do it anyway, I can't be here. This is too toxic of an environment and I am not okay. I want to leave."

87.     Ms. Mayorga walked into her office to get away from Mr. Greenberg but he kept following Ms. Mayorga trying to calm Ms. Mayorga down and tried to close her office door so they could speak.

88.     Ms. Mayorga then said "You even asked me what color my underwear was! Who does that? Especially in front of a room full of guys." Mr. Greenberg then started to say "oh I see how this is going to go. I thought we had banter going." Ms. Mayorga said "Banter is one thing. There is a line, Ira. You crossed that line. You don't ask someone else what color their underwear is or to see the hole." Mr. Greenberg said "Fine, so if this is how you want it, fine, we will have a strictly professional relationship from now on. No more banter. If this is the route you want to take, let me know."

89.     At this point, Ms. Mayorga did not feel comfortable anymore and said "No. I want someone else present. I don't want to be in a room alone with you. This is why things get swept under the rug with you because you have these private conversations where no one can hear. You have crossed the line with me and I've had enough stress. I want someone here. " Mr. Greenberg then started trying to cover himself by saying "So I have to take it when you come out of your office speaking Spanish?! I have to be subjected to that treatment?!" Ms. Mayorga told him that she only spoke Spanish when he made his comments about Ms. Mayorga being a Spanish/Latina woman to other people thinking it was funny.

90.     Ms. Mayorga was trembling and hyperventilating because Mr. Greenberg was trying to turn the tables on Ms. Mayorga. Ms. Mayorga called in Patrick McNeil (OFPC) to please stand as witness. Mr. Greenberg tried to tell him to get out because this was a private conversation.

Pat tried to leave but Ms. Mayorga said "no, if he's not in this room, I don't want to be either." Ms. Mayorga told him that if he wasn't going to take action, Ms. Mayorga was going to call Matthew Alilionis, her direct supervisor. Ms. Mayorga pulled out her phone and called Matt and told him "I want to be removed from this site immediately please. Matt, this is my official and formal notification to you that I want to be removed from this site. If you can't get me off this site, I'll call whoever I have to call. I'll even call Nikhil myself."

91.     Mr. Greenberg was still trying to speak but Ms. Mayorga was not listening to him at this point. Mr. Greenberg kept trying to come close to Ms. Mayorga and she told him that he is "triggering Ms. Mayorga back to when" they were in Jones Beach and Fountain Ave. Ms. Mayorga kept repeating to him that he is triggering her. At this point, Ms. Mayorga was experiencing a panic attack.

92.     Ms. Mayorga walked out of the office to the area outside of the command office to get away from Mr. Greenberg. Mr. Greenberg followed Ms. Mayorga out of the office. Ms. Mayorga walked away from him to the other side of the open area. Mr. Greenberg followed Ms. Mayorga there too. Mr. Greenberg kept trying to get Ms. Mayorga to go inside the office alone with him by coming close to Ms. Mayorga, and reached out and aggressively grabbed Ms. Mayorga's upper arm, and whispered to Ms. Mayorga "Sylvia, get inside the office, now" repeatedly. Ms. Mayorga pulled away from him and turned around and said "Ira, stop following me. Leave me alone.". Ms. Mayorga pulled away from him and turned around and said "Ira, stop following me. Leave me alone." Plaintiff called Matthew Alilionis to inform him of what was going on and that she was requesting to be removed from the site. As Plaintiff was trying to remove herself from Defendant Greenberg, she was on the phone with Matthew Alilionis.

93.     Mr. Greenberg kept following Ms. Mayorga so she turned around again, raised her voice, and said "STOP FOLLOWING ME, LEAVE ME ALONE." Mr. Greenberg walked away toward the command office. As Mr. Greenberg walked in, he turned around, looked at Ms. Mayorga and said "don't forget, Matt reports to me." Mr. Greenberg turned back around and walked into the office. As the door is closing, Ms. Mayorga yelled back at him "What do you mean 'he reports to you?! What do you mean by that?!" But he didn't come back out. Yamil Speight-Miller and two State Troopers who were transporting vaccines from Javits were present when this happened. At some point during all of this, Pat told Ms. Mayorga while Ira wasn't around "I'm so, so sorry about all of this. I don't want to get involved. I'm so sorry." He seemed genuinely scared of being involved in the situation with Ira and told Ms. Mayorga.

94.     Ms. Mayorga went back inside the command center and Mr. Greenberg angrily said "Get inside the office!" Ms. Mayorga went in and he said "I know you're going to blow this whole thing way out of proportion. Just think about everything I did for you..." Ms. Mayorga cut him off and called Pat to come came back inside because she did not want to be alone with him in that small space. Pat came in and closed the door. Ira didn't finish his previous statement after Pat was present. He then said he was going to call Nikhil. He tried to tell Nikhil that the planning section chief position was just too much for Ms. Mayorga to handle and that Ms. Mayorga was requesting to be removed from the site. He then walked into the office adjacent to Ms. Mayorga and whispered to Nikhil "she's having [another] [mental/emotional] [breakdown/meltdown]".

95.     Ms. Mayorga heard it and yelled out (so that Nikhil could hear Ms. Mayorga) "that's not true! I can handle being a planning section chief. What I can't handle is this hostile work environment and I am please requesting that I be removed immediately." Ms. Mayorga was

then told to go to Jones Beach to switch with Matt and that Nikhil wanted Ms. Mayorga to call him on her way down. So Ms. Mayorga packed her belongings and left the office.

96.     On several occasions, Mr. Greenberg was rude to Ms. Mayorga, and tried to apologize by saying "you know I'm just busting your chops. You're doing an amazing job. You're doing a great job." And almost always ends it with a hug like it's a band-aid.

97.     Mr. Greenberg also called Ms. Mayorga a glorified secretary once because she is a Hispanic female. When Mr. Greenberg would regularly speak to Ms. Mayorga, it was in a demeaning tone and it is far worse in the presence of other men. This was not only embarrassing but extremely unprofessional when done on a consistent basis like he would.

98.     On an almost daily basis, Mr. Greenberg would make comments to Ms. Mayorga about her race / national origin and gender, such as the following:

- "Oh, don't worry, she's Latina, they're always so emotional";
- "Don't pay attention to her, it's a Hispanic woman thing.";
- "Oh, you Spanish women..";
- "Don't let her get involved. She's dangerous with information.";
- "you Spanish women are so sensitive".

99.     These conversations were usually with someone else in Ms. Mayorga's presence, accompanied with laughter and facial gestures. Ms. Mayorga would give a short laugh because it was awkward. So to protect herself, she just played along with it.  Ms. Mayorga also did not want to be viewed as the one on the team who could not take a joke. John Dalen, Ian Jordan, and Patrick McNeil, and others, have all been witness to this as being her response to Ira "joking" about Ms. Mayorga being a Latina woman.

100.    Additionally, Mr. Greenberg on several occasions made comments against homosexuals. For example, prior to Mr. Greenberg being aware that Ms. Mayorga is bisexual, Mr. Greenberg expressed dismay that him and his group would have to cover the Gay Pride Parade in

New York City. Mr. Greenberg would call it the "Fag Fest" and in the presence of gay men would call them "butt buddies." In or around November 2019, Ms. Mayorga came out of the closet and informed Mr. Greenberg that she had a girlfriend named Kelly because Mr. Greenberg had inquired about her relationship status. Ms. Mayorga explained that she waited until after her probation period. Mr. Greenberg would also make comments about Ms. Mayorga's pride sneakers, stating "I cannot believe you are wearing those (pride) sneakers."

101.    When Ms. Mayorga first started at the Aqueduct site in Queens, her cousin had graduated from the Air Force and Ms. Mayorga watched his honor ceremony. Ms. Mayorga went out to the general command area and showed Ira and John Dalen the video stream of her cousin. Ms. Mayorga was very teary eyed and happy. Ira began making comments to John "have you ever seen [Hispanic/Spanish] hysteria?", "Hispanic women are so dramatic, look at her." And many other statements.

102.    Mr. Greenberg would make further comments towards Ms. Mayorga on an almost daily basis because she is a Hispanic female:

- "You just don't know when to shut up do you?";
- "You just don't listen to what I'm telling you to do.";
- "Just do what I say and we won't have a problem."

103.    Ms. Mayorga believes that DHSES did not properly and adequately conduct an investigation of Mr. Greenberg. As a result of Mr. Greenberg's actions, Ms. Mayorga was forced to go out on FMLA because of the emotional distress she sustained and for medical treatment.

104.    When Plaintiff was cleared to come back, she thought that she could handle being in that environment again. However, each day that passed, it became harder and harder for Plaintiff to work with Defendants. Following Plaintiff's return to work from FMLA leave, Plaintiff's anxiety and depression that she continued to experience because of Mr. Greenberg's actions was

exacerbated by the fear that she would come into contact with Mr. Greenberg again or that he would use other employees to retaliate against her. Plaintiff felt panicked and paranoid just by being in the office.

105.    As a result of the foregoing, in or around May 2021, Plaintiff constructively discharged her employment due to defendants intentionally creating a workplace so intolerable that any reasonable bisexual Hispanic female would have resigned.

106.    Plaintiff also believes that she was treated less favorably by Defendant Greenberg because of her gender because they she declined Defendant Greenberg's romantic advances.

107.    As a result of the sexual harassment, sexual harassment, hostile work environment due to race, national origin and gender by Defendant Greenberg, Sylvia Mayorga was caused emotional distress and loss of past and future income, commission and benefits.

**FIRST CLAIM OF RELIEF**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—**
**GENDER DISCRIMINATION IN TERMS, CONDITIONS, AND**
**PRIVILEGES**
**New York City Administrative Code**
**§ 8-107**
**(Against Defendant Ira Greenberg)**

108.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein

109.    Plaintiff was a former female employee of DHSES.

110.    During all times relevant to this claim, Plaintiff's supervisor, Defendant Greenberg, functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

111.    Defendant Ira Greenberg participated in the conduct giving rise to this claim. He aided, abetted, incited, compelled, or coerced the unlawful acts alleged herein.

112. Defendant Ira Greenberg subjected Plaintiff to discrimination in the terms, conditions, or privileges of employment in violation of the New York City Human Rights Law. Defendant Ira Greenberg has treated Plaintiff differently because of her gender and differently from and less preferably than similarly situated male employees.

113. Plaintiff's sex has been a determining factor in Defendant Ira Greenberg's subjecting of Plaintiff to discrimination in the terms, conditions, or privileges of her employment.

114. By reason of the continuous nature of Defendant Ira Greenberg's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

115. As a result of Defendant Ira Greenberg's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages

116. As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, attorneys' fees, costs, and other appropriate relief.

**SECOND CLAIM OF RELIEF**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—**
**SEXUAL HARASSMENT**
**New York City Administrative Code**
**§ 8-107**
**(Against Defendant Ira Greenberg)**

117. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

118. Plaintiff was a former female employee of DHSES.

119.    During all times relevant to this claim, Defendant Greenberg, who was and is employed by DHSES, functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

120.    Defendant Greenberg participated in the conduct giving rise to this claim. He aided, abetted, incited, compelled, or coerced the unlawful acts alleged herein.

121.    Defendant Greenberg subjected Plaintiff to unwelcome sexual harassment based on her sex. Defendant Greenberg subjected Plaintiff to unwelcome sexual conduct, including sexual comments and sexual advances, including inappropriate and unwanted touching, hugging and stares. . She rejected the unwelcome sexual advances and coercion perpetrated by Defendant Greenberg until she eventually constructively discharged her employment with Defendants.

122.    Plaintiff's reaction to that conduct was used as the basis for decisions affecting the compensation, terms, conditions, or privileges of her employment. Among other things, as a result of Plaintiff's rejection of her supervisor Defendant Greenberg's sexual advances, facilitated by DHSES, Defendant Greenberg obstructed Plaintiff's ability to perform her work.

123.    A reasonable woman would consider that she was being treated less well than other employees under all of the circumstances. Plaintiff actually considered that she was being treated less well than other employees because she is female.

124.    A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

125.     Defendant Greenberg created, enabled, and maintained a sexually hostile work environment.

126.    Defendant Greenberg fails to effectively communicate a firm policy against such practices to employees, agents, and persons employed on the premises.

127. Defendant Greenberg lacks a program to educate employees and agents about unlawful discriminatory practices under city laws.

128. Defendant Greenberg lacks procedures for the supervision of employees and agents and for the oversight of persons employed on the premises specifically directed at the prevention and detection of such practices.

129. By reason of the continuous nature of Defendant Greenberg's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

130. As a result of Defendant Greenberg's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

131. Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, attorneys' fees, costs, and other appropriate relief.

**THIRD CLAIM OF RELIEF**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS**
**LAW— HOSTILE WORK ENVIRONMENT**
**New York City Administrative Code § 8-107**
**(Against Defendant Greenberg)**

132. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

133. Plaintiff was a former female employee of DHSES.

134. Defendant Ira Greenberg – a supervisor of DHSES – was an employee, supervisor, manager and agent of Defendant DHSES. During all times relevant to this claim, Defendant Ira

Greenberg functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

135. Defendant Ira Greenberg participated in the conduct giving rise to this claim. He aided, abetted, incited, compelled, or coerced the unlawful acts alleged herein.

136. Defendant Ira Greenberg subjected Plaintiff to a hostile work environment based on her sex, sexual orientation, race and/or national origin.

137. The hostile work environment included sexual comments, racial comments, sexual advances, unwanted touching and hugging, and the obstruction of Plaintiff's work. All of this conduct was unwanted.

138. A reasonable woman would consider that she was being treated less well than other employees under all of the circumstances. Plaintiff actually considered that she was being treated less well than other employees because she is a Hispanic female and because she turned down the advances of her supervisor, Ira Greenberg.

139. A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

140. Defendant Ira Greenberg created, enabled, and maintained a sexually hostile work environment.

141. Defendant Ira Greenberg lacks a meaningful and responsive procedure for investigating complaints of discriminatory practices by employees, agents, and persons employed on the premises and for taking appropriate action against those persons who are found to have engaged in such practices.

142. Defendant Ira Greenberg fails to effectively communicate a firm policy against such practices to employees, agents, and persons employed on the premises.

143.    Defendant Ira Greenberg lacks a program to educate employees and agents about unlawful discriminatory practices under local, state, and federal laws.

144.    Defendant Ira Greenberg lacks procedures for the supervision of employees and agents and for the oversight of persons employed on the premises specifically directed at the prevention and detection of such practices.

145.    By reason of the continuous nature of Defendant Ira Greenberg's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

146.    As a result of Defendant Ira Greenberg's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

147.    Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, attorneys' fees, costs, and other appropriate relief.

**FOURTH CLAIM OF RELIEF**
**FOR BATTERY**
**(Against Defendant Ira Greenberg)**

148.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

149.    On or about January 2021, Ira Greenberg intentionally touched Plaintiff.

150.    Ira Greenberg's physical touching of Plaintiff was intentional, unwelcome and offensive.

151.     Ira Greenberg acted in his individual capacity and outside the scope of his employment when he intentionally grabbed and forcibly hugged Plaintiff.

152.     That Ira Greenberg's offensive conduct committed against Plaintiff, amounted to a series of harmful and offensive contacts to Plaintiff' person, all of which were done intentionally by Ira Greenberg without Plaintiff's consent.

153.     That by reason of the foregoing, the Plaintiff was caused to suffer injury, pain, discomfort, disability, and mental and emotional shock and distress and were damaged thereby.

154.     That Plaintiff have been damaged in an amount which exceeds the jurisdictional limits of all lower courts, which would otherwise have jurisdiction.

155.     That Plaintiff is entitled to punitive damages as Greenberg's wrongdoing evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply criminal indifference to civil obligations.

## FIFTH CLAIM OF RELIEF
### FOR ASSAULT
### (Against Defendant Ira Greenberg)

156.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

157.     That Ira Greenberg's offensive conduct committed against Plaintiff amounted to a series of events creating a reasonable apprehension in Plaintiff of immediate harmful and offensive contact to Plaintiff' person, all of which were done intentionally by Ira Greenberg without Plaintiff' consent.

158.     Ira Greenberg acted in his individual capacity and outside the scope of his employment when he intentionally grabbed and forcibly hugged Plaintiff.

159.     That by reason of the foregoing, the Plaintiff was caused to suffer injury, pain, discomfort, disability, and mental and emotional shock and distress and were damaged thereby.

160.     That Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower courts, which would otherwise have jurisdiction.

161.     That Plaintiff is entitled to punitive damages as Greenberg's wrongdoing evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply criminal indifference to civil obligations.

**SIXTH CLAIM OF RELIEF**
**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW,**
**NEW YORK STATE EXECUTIVE LAW 296, ET SEQ,**
**(Against Defendant Ira Greenberg)**

162.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

163.     Plaintiff is a female employee of DHSES.

164.     During all times relevant to this claim, Defendant Ira Greenberg functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

165.     Defendant Ira Greenberg illegally discriminated against Plaintiff by creating a hostile work environment for Plaintiff based on her gender. The hostile work environment created by Defendants were sufficiently pervasive so as to detrimentally alter the terms, conditions and privileges of Plaintiff's employment than other employees because of her gender.

166.     Defendant Greenberg further discriminated against Plaintiff based on her gender by continually sexually harassing her and subjecting her to materially different terms and conditions of employment than other employees because of her gender, sexual orientation, race and/or national origin.

167.    As a result of Defendant Ira Greenberg's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

168.    Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, attorneys' fees, costs, and other appropriate relief.

**SEVENTH CLAIM OF RELIEF**
**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW—**
**GENDER, SEXUAL ORIENTATION, RACIAL AND NATIONAL ORIGIN,**
**DISCRIMINATION IN TERMS, CONDITIONS, AND PRIVILEGES**
**New York State Human Rights Law**
**(Against Defendant Ira Greenberg)**

169.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein

170.    Plaintiff was a former female employee of DHSES.

171.    During all times relevant to this claim, Defendant Ira Greenberg functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

172.    Defendant Ira Greenberg participated in the conduct giving rise to this claim. He aided, abetted, incited, compelled, or coerced the unlawful acts alleged herein.

173.    Defendant Ira Greenberg has subjected Plaintiff to discrimination in the terms, conditions, or privileges of employment in violation of the New York State Human Rights Law. Defendants have treated Plaintiff differently from and less preferably than similarly situated males and non-Hispanic employees.

174.     Plaintiff's sex, sexual orientation, race, and/or national origin, have been a determining factor in Defendants' subjecting of Plaintiff to discrimination in the terms, conditions, or privileges of employment.

175.     As a result of Defendant Ira Greenberg's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages

176.     As a result of Defendant Ira Greenberg's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including back pay, front pay, compensatory damages,  attorneys' fees, costs, and other appropriate relief.

### EIGHTH CLAIM OF RELIEF
### VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW—
### SEXUAL HARASSMENT
### New York State Human Rights Law
### (Against Defendant Ira Greenberg)

177.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

178.     Plaintiff is a female employee of DHSES.

179.     During all times relevant to this claim, Defendant Ira Greenberg, functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

180.     Defendants Ira Greenberg, participated in the conduct giving rise to this claim. He aided, abetted, incited, compelled, or coerced the unlawful acts alleged herein.

181.     Defendants Ira Greenberg, and the aforementioned supervising attorneys subjected Plaintiff to unwelcome sexual harassment based on her sex. Defendant Ira Greenberg subjected

Plaintiff to unwelcome sexual conduct, including sexual comments and sexual advances. Plaintiff rejected the unwelcome sexual advances and coercion perpetrated by Ira Greenberg.

182.    Plaintiff's reaction to that conduct was used as the basis for decisions affecting the compensation, terms, conditions, or privileges of her employment. Among other things, as a result of Plaintiff's rejection of Ira Greenberg's sexual advances, Defendants obstructed Plaintiff's ability to perform her work.

183.    A reasonable woman would consider that she was being treated less well than other employees under all of the circumstances. Plaintiff actually considered that she was being treated less well than other employees because she is female.

184.    A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

185.    Defendant Ira Greenberg created, enabled, and maintained a sexually hostile work environment.

186.    By reason of the continuous nature of Defendants' discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

187.    As a result of Defendant Ira Greenberg's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

188.    Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including back pay, front pay, compensatory damages,  attorneys' fees, costs, and other appropriate relief.

## NINTH CLAIM OF RELIEF
## VIOLATION OF NEW YORK STATE HUMAN RIGHTS
## LAW— WRONGFUL TERMINATION
### New York State Human Rights Law
### (Against Defendant Ira Greenberg)

189. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein

190. Plaintiff was constructively discharged based on her sex, sexual orientation, and race / national origin when she was subjected to the Defendant Ira Greenberg sexual harassment, discrimination and hostile working environment, despite the Defendants' knowledge about such unlawful behavior, in violation of the New York State Human Rights Law.

191. The working conditions resulting from the Defendant Ira Greenberg's sexual harassment/ hostile working environment were so intolerable that a reasonable person in the respective employee's situation, such as the Plaintiff, would have felt compelled to resign.

192. As a direct and proximate consequence of the Defendant Ira Greenberg's intentional, unlawful, and discriminatory treatment, which led to the constructive discharge of the Plaintiff, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

193. Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## TENTH CLAIM OF RELIEF
## VIOLATION OF NEW YORK CITY HUMAN RIGHTS
## LAW— WRONGFUL TERMINATION
### New York City Human Rights Law
### (Against Defendant Ira Greenberg)

194.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein

195.    Plaintiff was constructively discharged based on her sex, sexual orientation, and race / national origin when she was  subjected to the Defendant Ira Greenberg sexual harassment, discrimination and hostile working environment, despite the Defendants' knowledge about such unlawful behavior, in violation of the New York City Human Rights Law.

196.    The working conditions resulting from the Defendant Ira Greenberg's sexual harassment/ hostile working environment were so intolerable that a reasonable person in the respective employee's situation, such as the Plaintiff, would have felt compelled to resign.

197.    A reasonable person would consider that she was being treated less well than other employees under all of the circumstances. Plaintiff actually considered that she was being treated less well than other employees because she is a Bisexual Hispanic female.

198.    As a direct and proximate consequence of the Defendant Ira Greenberg's intentional, unlawful, and discriminatory treatment, which led to the constructive discharge of the Plaintiff, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

199.    Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## ELEVENTH CLAIM OF RELIEF
## VIOLATION OF NEW YORK STATE HUMAN RIGHTS
## LAW— HOSTILE WORK ENVIRONMENT
### New York State Human Rights Law
### (Against Defendant Ira Greenberg)

200.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

201.    Plaintiff was a former female employee of DHSES.

202.    Defendant Ira Greenberg – the supervisor for DHSES – was an employee, manager and agent of Defendant DHSES. During all times relevant to this claim, Defendant Ira Greenberg functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

203.    Defendant Ira Greenberg participated in the conduct giving rise to this claim. He aided, abetted, incited, compelled, or coerced the unlawful acts alleged herein.

204.    Defendant Ira Greenberg subjected Plaintiff to a hostile work environment based on her sex, race, sexual orientation and national origin by making disparaging comments about Plaintiff's sexual orientation, race and national origin and gender.

205.    The hostile work environment included sexual comments, sexual advances, and the obstruction of Plaintiff's work. All of this conduct was unwanted.

206.    A reasonable woman would consider that she was being treated less well than other employees under all of the circumstances. Plaintiff actually considered that she was being treated less well than other employees because she is female and because she turned down the advances of her supervisor, Ira Greenberg.

207.    A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

208.     Defendant Ira Greenberg created, enabled, and maintained a sexually hostile work environment.

209.     By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

210.     As a result of Defendant Ira Greenberg's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

211.     Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including back pay, front pay, compensatory damages,  attorneys' fees, costs, and other appropriate relief.

## TWELFTH CLAIM OF RELIEF
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED— GENDER, SEXUAL ORIENTATION, RACE AND NATIONAL ORIGIN DISCRIMINATION IN TERMS AND CONDITIONS OF EMPLOYMENT
### (Against Defendant DHSES)

212.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

213.     Defendant DHSES has discriminated against Plaintiff by subjecting her to different treatment on the basis of her gender, sexual orientation, race and national origin.

214.     Defendant DHSES has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to disparate terms and conditions of employment in violation of Title VII.

215.     Defendants' differential treatment of Plaintiff is a direct and proximate result of gender, sexual orientation, race and national origin discrimination.

216.    Defendant DHSES has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

217.    By reason of the continuous nature of Defendant DHSES's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the  unlawful acts alleged herein.

218.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

219.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages,  and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**THIRTEENTH CLAIM OF RELIEF**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED—**
**SEXUAL HARASSMENT**
**42 U.S.C. § 2000(e) *et seq.***
**(Against Defendant DHSES)**

220.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

221.    The Defendant DHSES intentionally discriminated against the Plaintiff by creating and maintaining a sexually hostile work environment in violation of Title VII of the Civil Rights Act or 1964, 42 U.S.C. § 2000e et seq.

222.    The sexually hostile work environment created by the Defendant was severe, pervasive, and a part of a pattern or practice or harassment against the Plaintiff.

223.    The hostile working environment altered the Plaintiff's conditions of employment by creating an abusive, physically threatening, humiliating, and intolerable working environment.

224.    Defendant DHSES is strictly liable for the actions of their supervisor, Defendant Greenberg.

225.    Defendant DHSES knew of Defendant Greenberg's conduct and accepted it and/or failed to take immediate and appropriate corrective action.

226.    Defendant DHSES had the power to hire, fire, and alter the terms and conditions of the Plaintiff's employment.

227.    Defendant DHSES, through and together with Defendant Greenberg, participated in the conduct giving rise to the harassment and hostile work environment based on the Plaintiff's sex that altered the terms and conditions or their employment.

228.    As a direct and proximate consequence of the Defendant DHSES' intentional, unlawful, and discriminatory treatment of the Plaintiff, she has suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

229.    The sexual harassment altered Plaintiff's conditions of employment by creating an abusive working environment for her.

230.    Defendant DHSES has conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Plaintiff's rights, entitling her to damages.

231.    As a result of Defendant DHSES' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

232.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages,  and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### FOURTEENTH CLAIM OF RELIEF
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED— HOSTILE WORK ENVIRONMENT
### 42 U.S.C. § 2000(e) *et seq.*
### (Against Defendant DHSES)

233.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

234.    Defendant DHSES has subjected Plaintiff to a sexually and racially hostile work environment in violation of Title VII, due to her gender, sexual orientation, and race / national origin.

235.    Defendant DHSES has denied Plaintiff her personal right to work in an environment free of sexual harassment and disparaging comments based on her gender, sexual orientation and race and national origin.

236.    Defendant DHSES' discriminatory and harassing practices have been, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, and abusive, and Defendant tolerated, condoned, ratified, and/or engaged in the hostile work environment, or, in the alternative, knew, or should have known, of its existence and failed to take remedial action.

237.    By reason of the continuous nature of Defendant DHSES' unlawful conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

238.    As a result of Defendant DHSES' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

239.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages,  and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**FIFTEENTH CLAIM OF RELIEF**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED— WRONGFUL TERMINATION**
**42 U.S.C. § 2000(e)** *et seq.*
**(Against Defendant DHSES)**

240.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein

241.    Plaintiff was constructively discharged based on her sex, sexual orientation, and race / national origin when she was  subjected to the Defendants sexual harassment, discrimination and hostile working environment, despite the Defendants' knowledge about such unlawful behavior, in violation of Title VII. 42 U.S.C.§2000et seq.

242.    The working conditions resulting from the Defendants' sexual harassment/ hostile working environment were so intolerable that a reasonable person in the respective employee's situation, such as the Plaintiff, would have felt compelled to resign.

243.    A reasonable person would consider that she was being treated less well than other employees under all of the circumstances. Plaintiff actually considered that she was being treated less well than other employees because she is a Bisexual Hispanic female.

244. A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

245. Defendants created, enabled, and maintained a hostile work environment that a reasonable person in Plaintiff's shoes would have felt compelled to resign.

246. As a direct and proximate consequence of the Defendant's intentional, unlawful, and discriminatory treatment, which led to the constructive discharge of the Plaintiff, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

247. As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, exacerbation of her disability, and other economic damages and non-economic damages.

248. Plaintiff is entitled to all remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiff prays that this Court enter judgement in her favor and against Defendants for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States of America, and the City and State of New York;

B. An injunction and order permanently restraining Defendants from engaging in

any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career prospects and fulfillment;

E.      An award of damages to be determined at trial, to compensate Plaintiff for emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

F.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
February 1, 2023

MARK DAVID SHIRIAN P.C.

By: __/s/ Mark Shirian__
Mark D. Shirian, Esq.
*Attorneys for Plaintiff*
Sylvia Mayorga
228 East 45th Street - Suite 1700-B
New York, New York 10017
Tel.: (212) 931-6530
Fax: (212) 898-0163
Email: mshirian@shirianpc.com