UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                                  :
**SYLVIA MAYORGA**,                                               :
                                                                  :
                                    Plaintiff,                    :
                                                                  :   **MEMORANDUM DECISION AND**
                                                                  :   **ORDER**
                – against –                                       :
                                                                  :   22-CV-387 (AMD) (RML)
                                                                  :
**IRA GREENBERG**, **NEW YORK STATE**                             :
**DIVISION OF HOMELAND SECURITY AND**                             :
**EMERGENCY SERVICES**,                                           :
                                                                  :
                                    Defendants.                   :
---------------------------------------------------------------- X
**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings claims for wrongful termination, employment discrimination, sexual

harassment, and a hostile work environment—under Title VII of the Civil Rights Act of 1964

against her former employer, the New York State Division of Homeland Security and

Emergency Services ("DHSES"), and under the New York State Human Rights Law

("NYSHRL") and the New York City Human Rights Law ("NYCHRL") against her former

supervisor, Ira Greenberg.  She also brings state-law battery and assault claims against

Greenberg.  Before the Court is Greenberg's motion to dismiss for failure to state a claim.  As

explained below, the defendant's motion is denied.

## BACKGROUND

The following facts are drawn from the plaintiff's second amended complaint.  (ECF No.

39.)  The plaintiff, a 34-year-old bisexual Hispanic woman, worked for DHSES from March

2019 to May 2021.  (*Id.* ¶¶ 11, 23, 105.)  She was a Regional Coordinator for New York City

Region I, a job that required her to be "on for 24 hours a day and 7 days [a] week."  (*Id.* ¶ 23.)

Her direct supervisor was Matthew Alilionis, a Regional Director (*id.* ¶ 27); Alilionis and the

plaintiff reported to the defendant, an Assistant Commissioner (*id.* ¶¶ 21–22).  The defendant reported to Nikhil Natarajan.  (*Id.* ¶ 27.)

The plaintiff alleges that she was constructively discharged from her job because the defendant subjected her to a hostile work environment, sexually harassed her, and discriminated against her based on her "gender, sexual orientation, race and national origin."  (*Id.* ¶¶ 25–26.)

## I.  Discriminatory Comments and Behavior

Throughout her tenure at DHSES, the defendant commented about the plaintiff's gender, sexual orientation, race, and national origin.  He often commented on the plaintiff's identity as a Hispanic woman.  (*See, e.g.*, *id.* ¶ 97 ("Greenberg also called Ms. Mayorga a glorified secretary once because she is a Hispanic female."), ¶ 98 (listing the defendant's comments, which include the following: "Oh, don't worry, she's Latina, they're always so emotional;" "Don't pay attention to her, it's a Hispanic woman thing;" "Oh, you Spanish women;" "Don't let her get involved.  She's dangerous with information;" "You Spanish women are so sensitive"), ¶ 101 ("[H]ave you ever seen [Hispanic/Spanish] hysteria?"; "Hispanic women are so dramatic, look at her" (alteration in original)).)  These comments, which the defendant made "[o]n an almost daily basis" (*id.* ¶ 98), embarrassed the plaintiff (*id.* ¶97) and caused her "emotional distress" (*id.* ¶ 103).  According to the plaintiff, the defendant frequently spoke about her in this manner with other coworkers—in the plaintiff's presence and "accompanied with laughter and facial gestures."  (*Id.* ¶ 99.)  The plaintiff would respond with "a short laugh" "because it was awkward" and "to protect herself."  (*Id.*)  She did not want to be "viewed as the one on the team who could not take a joke."  (*Id.*)

The defendant also spoke to the plaintiff "in a demeaning tone" because of her identity as a Hispanic woman (*see, e.g., id.* ¶ 97)—frequently in front of other men.  His tone was "far worse in [their] presence."  (*Id.*)  He rejected her suggestions for improvements but accepted

2

similar "suggestions of male counterparts."  (*Id.* ¶ 61; *see also id.* ¶¶ 62–67, 72.)  He kept her

from "offer[ing] suggestions or her own opinions during meetings" (*id.* ¶ 68; *see also id.* ¶¶ 69–

74) and yelled or cut her off while she was speaking (*see, e.g.*, *id.* ¶¶ 35, 62, 63, 66, 70).  The

defendant "did not value [the plaintiff's] input because of her gender, race and national origin"

(*id.* ¶ 75) and favored her male colleagues (*see, e.g.*, *id.* ¶¶ 61, 67, 72, 76–77).  The defendant

also instructed Alilionis, the plaintiff's direct supervisor, "to tell [the plaintiff] not to wear

leggings to work anymore," even though "many other non-Hispanic women . . . were permitted"

to do so.  (*Id.* ¶ 48.)  The plaintiff "felt as though she was being singled out" as the only person

subject to this rule because of her "Hispanic genetics."  (*Id.* ¶ 49.)

The defendant also made derogatory remarks about gay people, both before and after the

plaintiff told him that she is bisexual.  (*Id.* ¶ 100.)  He "expressed dismay" that he had to "cover

the Gay Pride Parade," to which he referred with a homophobic slur.  (*Id.*)  He made similarly

belittling and offensive remarks about gay men.  (*Id.*)  The defendant also told the plaintiff that

that he could not believe that she was wearing gay pride sneakers.  (*Id.*)

## II.     Allegations of Sexual Harassment

The defendant frequently touched the plaintiff against her will.  Whenever he

"embarrass[ed] [her] publicly," he apologized in private and then "pulled [her] in for an

unwanted, inappropriate hug."  (*Id.* ¶ 46; *see also id.* ¶¶ 51, 86, 96, 121.)  The plaintiff did not

"push [the defendant] away for fear of retaliation."  (*Id.* ¶ 51.)  The plaintiff did not "witness Mr.

Greenberg attempting to hug other male coworkers."  (*Id.*; *see also id.* ¶ 46.)  The defendant also

"violated [the plaintiff's] personal space."  (*Id.* ¶ 50; *see, e.g.*, *id.* ¶ 29 ( the defendant "often

stood about 1-2 feet away from [the plaintiff], [with] her face . . . level with Mr. Greenberg's

belly button so [that] when she would look up, [her face] would be towards his crotch area"),

¶ 30 (the defendant "star[ed] at [the plaintiff] intensely [and] inched closer to [her] slightly in a

sexual manner," and stayed for "about ten seconds"), ¶ 45 (the defendant once "came up behind" the plaintiff and another female coworker and stood so close to them that "his belly was up against [the women's] shoulder[s]; his hip and thigh on the back of [their] arms." He "stood there for what felt like minutes."), ¶ 50 (the defendant "[ran] his hand down [the plaintiff's] braid as she walked by and inappropriately touched her braid").)

The defendant also subjected the plaintiff to other "unwelcome sexual conduct, including sexual comments and sexual advances." (*Id.* ¶ 121.) For example, he repeatedly commented on her appearance. (*Id.* ¶ 50.) "[O]n multiple occasions," he "referred to how much he liked [the plaintiff's] eyes and nose ring." (*Id.*) Once, he asked her if "those [were her] real eyes," and "star[ed] at [her] intensely as he inched closer" to her. (*Id.* ¶ 30.) On another occasion, he "whisper[ed] in her ear[,] 'by the way, I love the ponytail today'" and said "'he liked [her] hair like that' while running his /hand down her braid." (*Id.* ¶ 50.) When the plaintiff was ill and asked to work from home, the defendant ordered her to come to work; he said that "he was not happy" when she worked remotely "because he was a 'visual person.'" (*Id.* ¶¶ 55–56.) According to the plaintiff, the defendant "sounded very serious and very upset, presumably because [he] derived pleasure by staring at [the plaintiff]." (*Id.* ¶ 56.)

At one point, the plaintiff tore a hole "in the inner leg of her work pants near her crotch area." (*Id.* ¶ 79.) She told the defendant that she tore her pants but would cover it with her jacket and get another pair from home or buy a new pair later that day. (*Id.*) The defendant started laughing, and twice asked her to "let [him] see" the hole in her pants. (*Id.* ¶ 82). She refused, and he asked twice, "what color underwear [was she] wearing." (*Id.*) The plaintiff

again refused to answer.  (*Id.*)  When the other men in the room also laughed, the plaintiff "gave a nervous laugh" and walked away, "completely embarrassed and in shock."  (*Id.*)[1]

## III.    Work Environment

The defendant frequently "belittle[d]" and "scream[ed]" at the plaintiff, both in private and in the presence of others.  (*Id.* ¶¶ 33, 47; s*ee also, e.g.*, *id.* ¶¶ 35, 44, 66, 70.)  There were times when he apologized for his behavior, and told the plaintiff that she was doing a good job.  (*Id.* ¶ 96.)  He "almost always end[ed] [the apology] with a hug," which the plaintiff perceived to be a "band-aid."  (*Id.*)  After one incident, the defendant tried to "justify" his screaming: he said that he got "very volatile when situations arise because he has ADD/ADHD," "that's just the way he is," and the plaintiff "had to forgive him" when he got "out of line."  (*Id.* ¶ 40.)  He said "he would always . . . apologize after" his outbursts, and told the plaintiff to "go to him first" if she ever "had an issue with him" "so they could resolve it internally."  (*Id.*)  The plaintiff interpreted this instruction as a way for the defendant to be "the gatekeeper" of her complaints "so they would never be recorded."  (*Id.*)

The defendant also made it difficult for her to do her job "in the best way that was conducive to the operation."  (*Id.* ¶ 58.)  He contradicted other superiors' instructions (*id.* ¶¶ 31–36) and imposed inconsistent demands on the plaintiff.  (*Id.* ¶ 58 (the defendant "wanted [her] to have a broad reach in each of the branches so that he could be informed at all times through [her] but" also "wanted [her] to operate like his personal assistant"), ¶ 59 (the defendant "preferred to run the [general staff and command] meetings," even though that "infringed upon [the plaintiff's] duties and responsibilities"), ¶ 83 (the defendant assigned her a twice-daily report that another

---

[1] The defendant was with two or three other men, and "two other staff members walked" past "at different points during the conversation."  (*Id.* at 80.)

employee previously did, which the plaintiff felt was "too much" on top of her other responsibilities).)  He refused to listen when the plaintiff told him her responsibilities were overwhelming.  (*Id.* ¶ 83.)  The defendant also repeatedly shot down her suggestions for improvements at work.  (*See, e.g., id.* ¶¶ 61–74.)

The defendant withheld information that the plaintiff needed to do her job, "shar[ing] just enough to allow [her] to get the task done but not enough so that [she could have] an opinion about it," which "made [her] job extremely difficult because she was forced to complete tasks with bare minimum information."  (*Id.* ¶ 59; *see also id.* (the defendant prevented the plaintiff from joining meetings "that she should have sat in on for situational awareness and continuity of operations," and gave her orders "after coming out of any conference call without sharing more information"), ¶ 77 (the defendant told a colleague from the Department of Health that "he was not allowed to share information with [the plaintiff] anymore" and that the plaintiff "should not be involved in any conversations with DOH from now on").)  The plaintiff was forced to "rely[] heavily on [the defendant] for information" (*id.* at ¶ 59), but when she asked him "a question or [for] clarification, he would pretend to be bothered as if she did not know what she was doing and that she was pestering him" (*id.* ¶ 60).  The plaintiff perceived from "his body language" and in his manner of "speaking . . . matter-of-factly that [he] thoroughly enjoyed that she depended on him to some extent."  (*Id.*)

The defendant caused the plaintiff emotional distress, and often made her cry.  (*See id.* ¶¶ 33, 35, 36, 47.)  When that happened, she hid "in the third stall of the women's bathroom until the anxiety and panic attack[] episodes would pass."  (*Id.* ¶ 44.)  She was "always crying" at the Jones Beach test site, where other people "witnessed how Mr. Greenberg used to scream at and belittle [her]."  (*Id.* ¶ 47.)  The plaintiff's coworkers let her "hide" in a trailer that the defendant

never visited; one co-worker told her that "she could use [a] hidden corner any time she needed to get away, which she frequently [did] to be out of Mr. Greenberg's line of sight." (*Id.*) During her first year at DHSES, the defendant joked daily, in front of coworkers and her supervisor, about "firing" the plaintiff, including at a conference "Q&A session" with the DHSES Commissioner. (*Id.* ¶¶ 39, 41). The defendant "constantly remind[ed] [the plaintiff] that he could fire [her] at any time," "while laughing" at her. (*Id.* ¶ 42; *see also id.* ¶ 44.) The plaintiff "laugh[ed] along because she did not want to tell anyone that it was bothering [her,] for fear of losing her job." (*Id.* ¶ 42.) These jokes "overwhelm[ed]" and "embarrassed" the plaintiff and made her "nervous and visibly upset." (*Id.* ¶ 42.) She was "on edge" (*id.*) and had "anxiety and panic attacks" after he made the jokes (*id.* ¶ 44).

## IV.   The Plaintiff's Requests to Transfer Work Sites and to Take FMLA Leave

On January 29, 2021, the defendant gave the plaintiff a new task. (*Id.* ¶ 83.) She told him that she "felt overwhelmed with work" because "he [ was] putting too much on her plate." (*Id.* ¶¶ 84–85.) The defendant told her that he would take on one of her tasks "if he [had] to," but stated, "I hate to say it, [but] it is absolutely the planning section chief's job to do [the new task]." (*Id.* ¶ 85.) The plaintiff asked the defendant to "remove [her] from this [job] site immediately" and to "[f]ind a replacement planning section chief" because she could not "be here" if he was not going to listen to her saying "[it was] too much" and would "forc[e her] to do it anyway." (*Id.* ¶ 86.) She told him that the environment was "too toxic" and that she was "not okay." (*Id.*)

The plaintiff walked away but the defendant followed her into her office, and "tried to close her door" and "calm [her] down." (*Id.* at ¶ 87.) The plaintiff told the defendant that he "crossed a line" a few days earlier when he asked to see the hole in her pants. The defendant

responded, "Fine, so if this is how you want it, fine, we will have a strictly professional relationship from now on.  No more banter.  If this is the route you want to take, let me know." (*Id.* ¶ 88.)  The plaintiff became uncomfortable and asked that "someone else [be] present" because she did not want to be alone with the defendant.  (*Id.* ¶ 89.)  She told him, "This is why things get swept under the rug with you because you have these private conversations where no one can hear.  You have crossed the line with me and I've had enough stress.  I want someone here."  (*Id.*)  The defendant complained that the plaintiff spoke Spanish in the office, and said, "I have to be subjected to that treatment?!"  (*Id.*)  The plaintiff replied that she spoke Spanish only when the defendant "made his comments about [her] being a Spanish/Latina woman to other people[,] thinking it was funny."  (*Id.*)  At that point, the plaintiff "was trembling and hyperventilating because [the defendant] was trying to turn the tables on her."  (*Id.* ¶ 90.)  When she asked a coworker to be a "witness," the defendant told him to leave because it was a "private conversation."  (*Id.*)  The plaintiff called Alilionis and told him that she "want[ed] to be removed from this site immediately."  (*Id.* ¶ 90.)  The defendant tried to speak to the plaintiff, but she "was not listening to him at this point."  (*Id.* ¶ 91.)  She also told him repeatedly that he was "triggering her" by coming close to her.  (*Id.*)  She had a "panic attack."  (*Id.*)

The defendant followed the plaintiff out of the office.  (*Id.* ¶ 92.)  He "reached out and aggressively grabbed [her] upper arm," and repeatedly "whispered to [her,] 'Sylvia, get inside the office, now.'"  (*Id.*)  The plaintiff yelled at him to leave her alone.  (*Id.* ¶ 93.)  The defendant walked away, reminding her that Alilionis "reports to [him]."  (*Id.*)  The plaintiff asked what he meant, but the defendant did not answer.  (*Id.*)

The defendant "angrily" called her back inside a smaller office within the command center and said he knew she was "going to blow this whole thing way out of proportion.  Just

think about everything I did for you." (*Id.* ¶ 94.)  The plaintiff called back the other coworker "because she did not want to be alone with [the defendant] in that small space." (*Id.*)  The defendant called Natarajan, his supervisor, and told him that the plaintiff had asked to be "removed from the site" because her job "was just too much for [her] to handle. (*Id.*)  He whispered to Natarajan that the plaintiff was "having [another] [mental/emotional] [breakdown/meltdown]." (*Id.* (alterations in original).)  The plaintiff yelled that she could "handle being a section chief, but could not "handle this hostile work environment. (*Id.* ¶ 95.) She "request[ed] that [she] be removed immediately.'" (*Id.*)  Natarajan told the plaintiff to switch work sites with another colleague. (*Id.*)

The plaintiff "was forced" to take leave under the Family and Medical Leave Act "because of the emotional distress she sustained and for medical treatment." (*Id.* ¶ 103.)  The plaintiff returned from leave and "thought that she could handle being in that environment again," but found it "harder" each day. (*Id.* ¶ 104.)  The "anxiety and depression that she continued to experience because of Mr. Greenberg's actions was exacerbated by the fear that she would come into contact with [him] again or that he would use other employees to retaliate against her." (*Id.*)  She "felt panicked and paranoid just by being in the office." (*Id.*)  In May 2021, the plaintiff left her position at DHSES.

On April 16, 2021, the plaintiff filed a claim with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 6.)  On January 12, 2022, the EEOC notified the plaintiff of her right to sue. (*Id.* ¶ 7.)  The plaintiff commenced this action against DHSES and Greenberg on January 24, 2022, within 90 days of receiving the right-to-sue notice.  The plaintiff filed the operative second amended complaint on February 1, 2023, and the defendant filed his motion to dismiss on February 21, 2023.

## LEGAL STANDARD

A court considering a Rule 12 motion must accept as true the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft*, 556 U.S. at 678). Although the pleading standard does not require "detailed factual allegations," it demands "more than labels and conclusions" and "a formulaic recitation of a cause of action's elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"An employment discrimination complaint need not include [specific facts establishing a *prima facie* case of discrimination] and instead must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (quoting Fed. R. Civ. P. 8(a)(2)); *see also Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208 (2d Cir. 2020) ("Over a series of opinions, we clarified that *Iqbal* does not require a plaintiff to plead a *prima facie* case. Instead, it simply requires a plaintiff to assert [enough] nonconclusory factual matter . . . to nudge [her] claim[] across the line from conceivable to plausible to proceed."). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

**DISCUSSION**

The plaintiff brings discrimination, sexual harassment, hostile work environment, and wrongful termination claims under both the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").[2]  She also brings state-law claims for battery and assault.

The defendant contends that the plaintiff has not plausibly alleged that she suffered an adverse employment action (ECF No. 43-1 at 18), and that the sexual harassment and hostile work environment NYCHRL claims should be dismissed because the plaintiff has not shown "how she was treated less well than other employees,' because of her gender or otherwise" (*id.* at 23–24).  He also argues that the plaintiff has not alleged sufficiently "severe or pervasive" misconduct to plead the sexual harassment and hostile work environment NYSHRL claims (*id.* at 25), the assault and battery claims are time-barred (*id.* at 29 n.1), the assault claim should be dismissed because the plaintiff does not allege that she believed she was "in imminent apprehension of harmful contact" (*id.* at 28), and the battery claim should be dismissed because the plaintiff does not allege that the defendant's physical contact was "offensive or without her consent" (*id.* at 29).[3]

---

[2] The plaintiff's Sixth Claim of Relief alleges a general violation of the NYSHRL, N.Y. Exec. L. § 296 et seq., against the defendant.  The allegations related to this claim appear to duplicate her discrimination, sexual harassment, and hostile work environment claims under the NYSHRL (Seventh, Eighth, and Ninth Claims of Relief), rather than assert a different claim.  (*See* ECF No. 39 ¶¶ 162-168.)  Accordingly, the Court treats the Sixth Claim as coextensive with the plaintiff's other NYSHRL claims, and denies the motion to dismiss that claim.  *See, e.g.*, *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 65 n.3 (S.D.N.Y. 2020).

[3] The defendant states that the plaintiff has not established her wrongful termination claims under the NYSHRL and the NYCHRL but does not explain why or cite any case law.  (ECF No. 43-1 at 5.)  Therefore, the defendant's motion to dismiss is denied as to these claims.  *Roberts v. Capital One, N.A.*, 719 F. App'x 33, 37 (2d Cir. 2017) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]." (quoting *Niagara Mohawk Power Corp. v. Hudson River-Black Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012))).

I.      **Civil Rights Claims**

      a.      **Discrimination**

            i.      *NYSHRL*

The NYSHRL prohibits an employer from "discriminat[ing] against [an] individual in compensation or in terms, conditions or privileges of employment" based on race, national origin, sexual orientation, gender identity or expression, or sex.  N.Y. Exec. L. § 296(1)(a). NYSHRL discrimination claims are "governed by the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-CV-7163, 2022 U.S. Dist. LEXIS 166876, at *8 (E.D.N.Y. Sept. 15, 2022) (quoting *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 323–24 (S.D.N.Y. 2020)).  That framework requires a plaintiff to "establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances giv[e] rise to an inference of discrimination."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).  To prevail at the motion to dismiss stage, a plaintiff need only allege that "(1) the employer took adverse action against [her] and (2) [her] race, color, religion, sex, [] national origin[, sexual orientation, or gender identity or expression] was a motivating factor in the employment decision."  *Id.* at 87; *see, e.g.*, *Stidhum*, 2022 U.S. Dist. LEXIS 166876, at *8–9 (applying this pleading standard to NYSHRL claim).

The defendant argues that the plaintiff has not alleged "any employment action at all," because her "breaking point" at DHSES occurred when the defendant gave "her *additional* responsibility."  (ECF No. 43-1 at 18.)  He also maintains that constructive discharge is not an

adverse action, but that even if it were, the plaintiff does not sufficiently allege that discrimination caused her constructive discharge.  (*Id.* at 20.)

In fact, an adverse employment action "may . . . take the form of a constructive discharge" for purposes of a NYSHRL discrimination claim.  *Pompey-Primus v. Success Acad. Charter Sch., Inc.*, No. 21-CV-3981, 2022 U.S. Dist. LEXIS 29313, at *9 (S.D.N.Y. Feb. 17, 2022) (quoting *Caskey v. Cnty. of Ontario*, 560 F. App'x 57, 59 (2d Cir. 2014)); *Atkinson v. Prabhjot Singh*, No. 19-CV-3779, 2022 U.S. Dist. LEXIS 8203, at *38 (S.D.N.Y. Jan. 14, 2022) ("[B]ecause '[a] constructive discharge is functionally the same as an actual termination,' it 'therefore is considered an adverse employment action.'" (quoting *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 177 (E.D.N.Y. 2013))).  A plaintiff establishes constructive discharge by alleging that (i) the employer "inten[ded] to create an intolerable environment that forces the employee to resign" and (ii) "a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign."  *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 308 (2d Cir. 2017) (quoting *Adams Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014)).

The plaintiff plausibly alleges that she was constructively discharged.  According to the complaint, the defendant frequently belittled the plaintiff's intelligence and abilities both in private and in front of others; he also yelled at her and made her cry.  (ECF No. 39 ¶¶ 33, 35, 44, 47, 66, 70.)  The defendant regularly used sexist and racist language (s*ee, e.g.*, *id.* ¶¶ 97–99, 101–02), subjected her to unwelcome, sexualized conduct (*see, e.g.*, *id.* ¶¶ 30, 50, 55–56, 79–82, 121), and made disparaging remarks about gay people (*id.* ¶ 100).  The defendant gave the plaintiff unwelcome hugs, joked about firing her in private and in front of coworkers, dismissed her ideas while complimenting similar ideas proposed by men, and kept important information

from her—something he did not do with male employees.  "This is more than enough to plead the adverse employment action of constructive discharge."  *Atkinson*, 2022 U.S. Dist. LEXIS 8203, at *39–40 (finding constructive discharge on similar facts).

The defendant argues that the allegations of constructive discharge are insufficient because the plaintiff quit four months after she transferred out of the defendant's job site, and because she had been promoted twice and given more responsibilities when she worked at his site.  (ECF No. 43-1 at 19.)  But the complaint alleges that the plaintiff requested a transfer specifically because the defendant's site was "too toxic" and that she was "not okay" working there.  (ECF No. 39 at ¶ 86.)  Moreover, the plaintiff alleges that she took FMLA leave because the defendant's conduct caused her emotional distress, requiring medical treatment.  (*Id.* ¶ 103.)  When she returned from medical leave, she was afraid to see the defendant, and feared that "he would use other employees to retaliate against her."  (*Id.* ¶ 104.)  These allegations are a sufficient "link" (ECF No. 43-1 at 20) between the defendant's conduct and the constructive discharge.  *Stidhum*, 2022 U.S. Dist. LEXIS 166876, at *8–9.  The fact that the plaintiff was promoted does not negate her allegations of constructive discharge.  According to the complaint, the defendant harassed her, berated her and made sexualized remarks to her throughout her time at DHSES.

The plaintiff also sufficiently alleges that she was constructively discharged "at least in part for a discriminatory reason."  *Vega*, 801 F.3d at 87.  A plaintiff pleads an inference of discrimination when she alleges that she suffered an adverse employment action "because of" her protected characteristics.  *Id.* at 88.  Other circumstances giving rise to an inference of discrimination include but are not limited to "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's

14

protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

The allegations of the "intolerable environment" that led to the plaintiff's constructive discharge are more than sufficient to satisfy this standard. The defendant's conduct went far beyond "normal work-related conflicts and/or personality grievances." (ECF No. 43-1 at 15.) The plaintiff alleges that the defendant regularly screamed at her, made degrading comments about her, her clothing and her job performance, used racist and sexist language, leered at her, and treated male employees more favorably. She also alleges that the defendant's conduct led her to take FMLA leave for medical treatment. Therefore, she has pled constructive discharge.

      *ii.*    *NYCHRL*

Section 8-107(1)(a) of the NYCHRL prohibits discrimination "in compensation or in terms, conditions or privileges of employment." To state a NYCHRL discrimination claim, a plaintiff must allege that she was "treated less well than other employees because of her gender," *i.e.*, she "suffer[ed] 'unwanted gender-based conduct.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 76, 78 (1st Dep't 2009)). As the defendant points out (ECF No. 43-1 at 21), the NYCHRL is not a "general civility code and does not apply to conduct that 'a reasonable victim would consider petty slights and trivial inconveniences,'" *Yost v. Everyrealm, Inc.*, No. 22-CV-6549, 2023 U.S. Dist. LEXIS 31246, at *32 (S.D.N.Y. Feb. 24, 2023) (citations omitted). Nevertheless, the Court must "construe [the NYCHRL] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.*

The plaintiff need not establish "a 'materially adverse' change to terms or conditions of employment, . . . only that she [] was subject to an unfavorable change or treated less well than other employees on the basis of a protected characteristic." *Golston-Green v. City of New York*, 184 A.D.3d 24, 38 (2d Dep't 2020). The NYCHRL's standard is either equivalent to or more lenient than the NYSHRL's, so the plaintiff's allegations that she was constructively discharged under the NYSHRL clearly plead "an unfavorable change" under the NYCHRL. *See LeTtieri v. Anti-Defamation League Found.*, No. 22-CV-9889, 2023 U.S. Dist. LEXIS 141914, at *34 n.15 (S.D.N.Y. Aug. 10, 2023) (citations omitted). The allegations making out the NYSHRL claim also establish that the defendant treated the plaintiff "less well than other employees on the basis of a protected characteristic." *Golston-Green*, 184 A.D.3d at 38.

### b.    Sexual Harassment and Hostile Work Environment

#### i.    NYSHRL

The defendant argues that the plaintiff has not alleged "severe or pervasive" "discriminatory intimidation, ridicule, and insult" in the workplace sufficient to "alter the conditions of [her] employment and create an abusive working environment." (ECF No. 43-1 at 25.)[4] The NYSHRL was amended on October 11, 2019 to eliminate the "severe or pervasive" requirement in favor of a more lenient standard of liability. *LeTtieri*, 2023 U.S. Dist. LEXIS 141914, at *34 n.15 (citation omitted).[5] Courts construe the amended NYSHRL "liberally for

---

[4] The NYSHRL does not have an independent hostile work environment claim; rather, a plaintiff can bring a sexual harassment claim under a hostile work environment theory. *See, e.g., Father Belle Cmty. Ctr. v. N.Y. State Div. of Human Rights*, 221 A.D.2d 44, 50–51 (4th Dep't 1996) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64–65 (1986)). Therefore, the Court analyzes these claims together.

[5] NYSHRL claims accrue "when the last alleged 'unlawful employment practice' or 'discriminatory act' occurs." *Delo v. Paul Taylor Dance Found., Inc.*, No. 22-CV-9416, 2023 U.S. Dist. LEXIS 133712, at *23 (S.D.N.Y. Aug. 1, 2023) (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007)). Accordingly, the plaintiff's claims accrued in May 2021, when she was constructively discharged from DHSES. *See, e.g., Maiurano v. Cantor Fitzgerald Sec.*, 19-CV-10042, 2021 U.S. Dist. LEXIS 3762, at *10 n.2 (S.D.N.Y. Jan. 8, 2021) (finding the plaintiff's NYSHRL hostile work

the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed." *Id.* (quoting *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020)).  Thus, the plaintiff need only allege that she was subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more of the[] protected categories."  N.Y. Exec. L. § 296(1)(h).

The defendant's argument is based the pre-2019 version of the NYSHRL.  "Given [the defendant's] reliance on an outdated standard, the Court is unable to conclude that . . . [he] established as a matter of law that [the plaintiff] has not stated a plausible claim for relief." *Wray v. Westchester Med. Ctr. Advanced Physician Servs., P.C.*, No. 21-CV-394, 2022 U.S. Dist. LEXIS 142699, at *29 (S.D.N.Y. Aug. 9, 2022) (citation omitted).

In any event, the complaint easily satisfies the NYSHRL.  As detailed above, the plaintiff describes multiple instances of the defendant's "discriminatory, offensive, and sexually harassing behavior" that he "regularly targeted [at the plaintiff]."  *Quintero v. Angels of the World*, No. 19-CV-6126, 2021 U.S. Dist. LEXIS 172445, at *21 (E.D.N.Y. Sept. 10, 2021); *see id.* at *23–24 (collecting cases with similar facts that satisfied the "severe or pervasive" standard).[6]

       *ii.*    *NYCHRL*

---

environment claim accrued on the date "when she was terminated" by her employer); *Wray v. Westchester Med. Ctr. Advanced Physician Servs., P.C.*, No. 21-CV-394, 2022 U.S. Dist. LEXIS 142699, at *2, *11, *28–29 (S.D.N.Y. Aug. 9, 2022) (applying amended standard where the plaintiff was subject to alleged discriminatory conduct beginning in December 2008 and was ultimately terminated from her position on December 2019).

[6] The defendant contends that the complaint's description of his request to see the hole in her pants does not include an allegation that he made that request "in a sexual manner or motivated by the plaintiff's gender."  While there might be a situation in which a supervisor's questions to a subordinate about her underwear are not made "in a sexual manner" or motivated by the subordinate's gender, the factual allegations in the complaint are sufficient to make that claim.  These allegations are not simply "bare legal conclusions [attached] to normal work-related conflicts and/or personality grievances."  (ECF No. 43-1 at 15.)

The NYCHRL does not have "separate standards" for discrimination, harassment and hostile work environment claims; "rather, 'there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender," sexual orientation, race, and national origin." *McHenry*, 510 F. Supp. 3d at 66 n.5 (quoting *Clarke v. Intercontinental Hotels Grps., PLC*, No. 12-CV-2671, 2013 U.S. Dist. LEXIS 76208, at *37–38 (S.D.N.Y. May 30, 2013)); *Raji v. Societe Generale Ams. Sec. LLC*, No. 15-CV-1144, 2018 U.S. Dist. LEXIS 36715, at *19 (S.D.N.Y. Feb. 28, 2018) (quoting *Roberts v. United Parcel Serv., Inc.*, 115 F. Supp. 3d 344, 368 (E.D.N.Y. 2015)).  The plaintiff's allegations establish an NYCHRL discrimination claim, and therefore also state sexual harassment and hostile work environment claims.

## II.    State-Law Tort Claims

### a.    Statute of Limitations

The plaintiff's assault and battery claims are time-barred as to any incidents that occurred before January 24, 2021, one year before she filed her original complaint.  *See* N.Y. C.P.L.R. § 215(3) (providing that "an action to recover damages for assault[ or] battery" "shall be commenced within one year").[7]  However, the allegations about the incident on January 29, 2021 (see ECF No. 39 at ¶¶ 86–96) are not time-barred, and are sufficient to state both assault and battery claims.

### b.    Assault

---

[7] The plaintiff states that she will "amend her complaint at the appropriate time to address" the statute of limitations issue by invoking "the Adult Survivor[s] Act" (ECF No. 48 at 25), i.e., N.Y. C.P.L.R. § 214-j, which extends the statute of limitations for certain sexual offense actions.  The plaintiff does not appear to argue that the ASA applies to the operative complaint, so the Court does not consider the argument.

The defendant argues that the plaintiff does not allege that she "believed she might have been in imminent apprehension of harmful contact," and that the "actual physical contact alleged" was "non-threatening in nature."  (ECF No. 43-1 at 28.)  A plaintiff states an assault claim by alleging that "the defendant intended either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact."  *Bouveng v. NYG Capital LLC*, No. 14-CV-5474, 2015 U.S. Dist. LEXIS 70976, at *26 (S.D.N.Y. June 2, 2015) (quoting *Wahlstrom v. Metro-N. Commuter R.R. Co.*, 89 F. Supp. 2d 506, 528 (S.D.N.Y. 2000)).  Conduct is "offensive" when it is "wrongful under all the circumstances;" lack of consent supports a conclusion that the conduct is offensive.  *Goff v. Clarke*, 302 A.D.2d 725, 726 (3d Dep't 2003) (quoting *Zgraggen v. Wilsey*, 200 A.D.2d 818, 819 (3d Dep't 1994)).

The defendant does not address whether his alleged conduct was offensive, but the facts and context of the allegations suggest that that defendant intended to arouse apprehension of offensive rather than harmful bodily contact.  (ECF No. 39 ¶¶ 150, 157.)  The plaintiff alleges that he "put his left arm around [her] and said 'look, come here'" but that she pushed him away (*id.* ¶ 86); the defendant also "[came] close to [the plaintiff] and reached out and aggressively grabbed [her] upper arm" (*id.* ¶ 92).  During the same interaction, the defendant "upset" her (*id.* ¶ 85), spoke to her "sarcastically" and questioned her capabilities, and cut her off while she was trying to answer his question (*id.* ¶¶ 83–85).  Two days earlier, the defendant repeatedly asked about the color of her underwear, and even asked to see a hole in her pants.  (*Id.* ¶ 82.)  The plaintiff also alleges that the defendant touched her, made sexualized comments to her, and hugged her, even though his hugs were always "unwelcome" and "unwanted" (*id.* ¶¶ 121, 137); indeed, she alleges that she pushed him away when he tried to hug her on January 29, 2019 (*id.* ¶ 86) and told him that she did not want to be in a room alone with him.  Finally, she alleges that

19

he grabbed her arm and told her to go inside the office with him after she tried to walk away

from him repeatedly.  (*Id.* ¶ 92).  At this stage of the litigation, the allegations are sufficient.

    **c.**    **Battery**

    For the same reasons, the complaint states a battery claim.  The defendant made bodily

contact, the contact was offensive, he intended the contact, and the plaintiff did not consent.

*Naughright v. Weiss*, 826 F. Supp. 2d 676, 685 (S.D.N.Y. 2011).

**CONCLUSION**

For these reasons, the defendant Ira Greenberg's motion to dismiss the complaint for failure to state a claim is denied.

**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      September 28, 2023